792 So.2d 789 (2001)
STATE of Louisiana, Appellee,
v.
Daniel L. CHEEKS, Appellant.
No. 34,772-KA.
Court of Appeal of Louisiana, Second Circuit.
June 20, 2001.
Amy E. Ellender, Louisiana Appellate Project, Counsel for Appellant.
Richard Ieyoub, Attorney General, Paul Carmouche, District Attorney, Edwin Blewer, III, Catherine M. Estopinal, Assistant District Attorneys, Counsel for Appellee.
*790 Before NORRIS, BROWN and DREW, JJ.
BROWN, J.
Defendant, Daniel L. Cheeks, was convicted of the forcible rape of his former girlfriend and sentenced to ten years at hard labor, with two years of the sentence to be served without benefit. Defendant, questioning the sufficiency of the evidence, has appealed his conviction. Finding no error, however, we affirm.

Applicable Law
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Bosley, 29,253 (La.App.2d Cir.04/02/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984).

Facts
Defendant and the victim, though not married, had an "on again, off again" relationship in which they lived together then separated on several occasions. During their approximately year-long relationship, twin children were conceived and born. On September 12, 1998, defendant and the victim had been broken up for two weeks. The victim was living with her cousin, Chris Brown, and defendant was living with Billy Barber, the victim's mother's boyfriend, in a residence two streets away from Brown's home.
At approximately 11:00 p.m. on September 11, 1998, the victim got home from work. About an hour later, defendant came over and helped her put their three-month-old twin daughters to bed and wash and prepare bottles for the next day. This was a regular occurrence and, after visiting with the victim and his daughters, defendant would walk the short distance to his residence. On the night of September 11th, however, it was raining hard and defendant asked the victim to give him a ride home. The victim had been to Barber's house to visit defendant on only one other occasion. Because of the rain, she agreed to drive defendant home. She put a jacket over her nightshirt and drove defendant home around 1:30-2:00 a.m.
The victim testified at trial that after she stopped in front of defendant's house, he tried to talk her into resuming their relationship. She told him that she didn't think they would ever get back together again and he became angry and hit her in the face. Defendant told the victim not to say anything or he would "beat her down" right in front of the house. He then pulled her by her hair into his house. Once inside, defendant told the victim to take off her clothes and have sex with him. When she refused, defendant pulled a hunting knife out of a drawer in the bedroom and demanded again that she get undressed and lie on his bed. At that time, the victim complied with his demands. Defendant turned on the TV and put a pornographic movie into the VCR and said they were going to watch the movie and have sex. All the while, he had the knife in his hand.
Defendant asked to see her "privates" because he thought that she had been having sex with someone else. Defendant *791 performed oral sex on the victim without her consent. He then had forced vaginal intercourse without using a condom. Defendant told her that she couldn't leave his room. At that point, defendant was no longer in possession of the knife.
Some time later, in an attempt to escape, the victim asked to go to the bathroom where she planned to crawl out through a window. Defendant followed her into the bathroom. When he realized that she didn't need to go to the bathroom, he struck her again and pulled her back into the bedroom where he again had forced intercourse with her.
Mary Williams, the victim's best friend, who was also staying with Chris Brown, testified that around 4:30-5:00 a.m. she was awakened by the victim's babies' crying. Mary realized at that time that the victim had not returned from taking defendant to his house. She awakened Brown, who went to find out what had happened to his cousin.
Brown arrived at defendant's home shortly after the second time that defendant forced the victim to have sex with him. Brown banged on the door for a long time before defendant finally opened the door. Defendant was naked, holding his underwear. Brown asked for his cousin and related that the babies were crying. Defendant said something to the effect of, "Well, she's mad because Ishe got hers, and I ain't got mine." Defendant admitted hitting the victim because he "didn't get his."
As defendant was talking to Brown, the victim put on her sleep shirt and jacket, but not her bra or panties, and ran past defendant, who was still standing at the door. She got into her vehicle and drove home. Upon her arrival there, she told Mary what had happened. Both Ms. Williams and Brown observed that the victim had bruises on her face and a busted lip that were not there when she left to take defendant home. The victim then called the Shreveport Police Department.
At trial, defendant testified that while the victim was driving him home, they began to argue about finances. He further stated that the victim went voluntarily into his house to help him carry in some clothes. Defendant denied pulling the victim into the house or pulling a knife on her once she was inside the home.
Defendant further testified that after entering his house, he and the victim drank beer and watched a porno movie together. They then had consensual oral sex on each other, then engaged in consensual vaginal intercourse. According to defendant, however, "we had sex together, but I really didn't want to because it wasn't really on my mind." Thereafter, they started arguing again about money. This led to a fight during which defendant slapped the victim once in the face. The parties calmed down, went to sleep, then were awakened by Chris Brown banging on the door. Defendant testified that what he told Brown was that "she tricked me."
The investigating officers took the victim to LSUMC, where a rape exam was conducted by Dr. Sabrina Holloman. Dr. Holloman noted facial injuries in her report. During the rape exam, Dr. Holloman found sperm pooled in the vaginal vault, which was submitted for DNA testing.[1] Dr. Holloman found mild vaginal redness, but no tears or abrasions. At trial, Dr. Holloman agreed that the medical examination was consistent with either rape or consensual sex.
The morning of September 12, 1998, a police detective went to defendant's home to arrest him. The officer banged on the door for a long time, but no one answered. The detective suspected that defendant *792 was in the house and posted a patrol unit outside while he secured a search warrant. At trial, defendant testified that he was in the house that morning, but because he was a heavy sleeper, he did not hear the officer banging on the door.
By the time the officer returned with the search warrant, the house was empty and there was evidence that someone had left by the back entrance. At the same time, the owner of the house, Billy Barber, arrived and consented to a search, which revealed a hunting knife in a drawer in defendant's bedroom. The search also revealed a porno video in the VCR in defendant's bedroom. Barber told the officer that the knife was not his. In a subsequent statement and at trial, defendant denied ever seeing the knife, denied that the knife was his and denied using the knife to threaten the victim.[2]
A jury trial was held February 14-16, 2000. The 12-person jury returned a unanimous verdict finding defendant guilty of forcible rape. On June 19, 2000, the trial court sentenced defendant to ten years at hard labor, two years of which were to be served without benefit. Defendant has appealed his conviction.

Discussion
Defendant contends that the evidence was insufficient to support the jury's verdict of forcible rape.[3] According to defendant, the victim's version of the events is suspicious, in light of the evidence presented at trial as to the couple's ongoing relationship, the fact that defendant had been in the victim's home to spend time with her and the children, the lack of vaginal tears or abrasions and considering that the victim, who weighed 230 pounds and claimed to have been pulled by her hair, lacked injuries to her scalp.
Unless unreasonable, a reviewing court must defer to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Bosley, supra. The jury believed the victim's version of the events of the early hours of September 12, 1998. The physical evidence and testimony of the state's witnesses clearly support the jury's decision. This assignment of error is meritless.

Conclusion
For the reasons set forth above, defendant's conviction and sentence are AFFIRMED.
NOTES
[1] At trial, the parties stipulated that the sperm was defendant's.
[2] At sentencing, defendant submitted a letter in which he claimed that the victim pulled the knife on him.
[3] Defendant was convicted of forcible rape, which is defined by La.R.S. 14:42.1 as follows:

(A) Forcible rape is rape committed when the anal or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.
(2) When the victim is incapable of resisting or of understanding the nature of the act by reason of stupor or abnormal condition of the mind produced by a narcotic or anesthetic agent or other controlled dangerous substance administered by the offender and without the knowledge of the victim.
(B) Whoever commits the crime of forcible rape shall be imprisoned at hard labor for not less than five nor more than forty years. At least two years of the sentence imposed shall be without benefit of probation, parole, or suspension of sentence.