## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 08-1070

**STATE OF LOUISIANA**

**VERSUS**

**H.L.J.**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**APPEAL FROM THE
THIRTEENTH JUDICIAL DISTRICT COURT
PARISH OF EVANGELINE, NO. 75068-F
HONORABLE THOMAS F. FUSELIER, DISTRICT JUDGE**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**JAMES T. GENOVESE
JUDGE**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

Court composed of John D. Saunders, Michael G. Sullivan, and James T. Genovese, Judges.

**AFFIRMED AS AMENDED WITH INSTRUCTIONS.**

**Edward K. Bauman**
**Louisiana Appellate Project**
**Post Office Box 1641**
**Lake Charles, Louisiana 70602**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **H.L.J.**


**Trent S. Brignac**
**District Attorney – Thirteenth Judicial District**
**Kathy Meyers**
**Assistant District Attorney**
**Post Office Drawer 780**
**Ville Platte, Louisiana 70586**
**(337) 363-3438**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**GENOVESE, Judge.**

## PROCEDURAL HISTORY

On November 20, 2007, Defendant, H.L.J.,[1] was indicted by an Evangeline

Parish grand jury on one count of aggravated rape.  On June 16, 2008, pursuant to

trial by jury, the jury returned a responsive verdict of guilty of forcible rape in

violation of La.R.S. 14:42.1.

On October 2, 2008, Defendant was sentenced to serve twenty-five years at

hard labor, with the first two years to be served without benefit of probation, parole,

or suspension of sentence.  Defendant moved for reconsideration of his sentence on

the grounds of excessiveness, which the trial court denied.

Defendant appeals his conviction and sentence, alleging insufficiency of the

evidence and excessive sentence as his assignments of error.  For the following

reasons, we affirm Defendant's conviction and sentence, but amend his sentence to

reflect that he is denied diminution of sentence pursuant to La.Code Crim.P. art.

890.1(B) as opposed to La.R.S. 15:571.3.

## STATEMENT OF FACTS

Lieutenant Chris Godeaux, of the Mamou Police Department, was the first

witness to testify at trial.  Lieutenant Godeaux was on duty and patrolling by himself

in the early morning hours of August 19, 2007, when the dispatcher sent him to a

particular address in Mamou.  When he arrived at the address, Lieutenant Godeaux

heard a male and female arguing inside the residence.  He knocked on the door, and

Defendant, who was completely naked, answered the door.  At that time, Defendant's

estranged wife, B.F.J., exited the house wearing a pink nightgown and appeared

---

[1]Initials are being used for both Defendant and the victim in order to protect the confidentiality of the victim in accordance with La.R.S. 46:1844(W).

1

hysterical. Lieutenant Godeaux then instructed Defendant to dress and exit the residence.

Lieutenant Godeaux reported that, after Defendant put on a pair of pants and exited the home, he handcuffed Defendant and detained him on the porch until he could determine what had happened. Lieutenant Godeaux then went to find B.F.J., who had gone to a residence across the street. B.F.J., who was still hysterical and crying, stated that she awoke to find Defendant standing in her bedroom. When she asked why he was there, Defendant told her, "I came here to kill you." Defendant had a knife in his hand. B.F.J. instructed Defendant to leave, but he refused. Defendant repeated that he was going to kill her and told her that before he killed her, "[he was] gonna get [him] some." Lieutenant Godeaux described B.F.J. as being distraught and "a mess" during the interview.

Lieutenant Godeaux related that B.F.J. told him Defendant had raped her, and, in accordance with protocol, he contacted Chief Dupuis, Assistant Chief Katina Richard, and Acadian Ambulance. Once an ambulance arrived, the paramedics transported B.F.J. to the hospital. B.F.J. was still very hysterical and frantic when Lieutenant Godeaux turned her over to the paramedics.

Before she left for the hospital, B.F.J. told Lieutenant Godeaux that Defendant had a knife, but that she had been able to get it away from him when he set it on the floor during intercourse. Lieutenant Godeaux related that B.F.J. told him that she had hidden the knife inside a towel that she had used to clean herself. B.F.J. stated that she had taken the knife with her when she went across the street and dropped it in the ditch. After B.F.J. pointed to where she had dropped the knife, Lieutenant Godeaux, with the assistance of two of B.F.J.'s neighbors, located the weapon and collected it

2

as evidence. Lieutenant Godeaux and Assistant Chief Richard tagged the knife and locked it away in the evidence room. At trial, the State presented Lieutenant Godeaux with a folding knife in an evidence box, and he identified it as the weapon taken from the ditch.

Lieutenant Godeaux described the ditch as a straight drainage ditch that ran along a roadway intersecting the street where B.F.J. lived. He stated that it had water in it which wet the knife. Lieutenant Godeaux did not take fingerprints from the knife because of the moisture and because it was recovered from the location pointed out by B.F.J.

Lieutenant Godeaux reported that he and Assistant Chief Richard entered the house for the purpose of investigating and collecting evidence after they had interviewed the witnesses. Defendant did not live in the house with B.F.J. Lieutenant Godeaux inspected B.F.J.'s bedroom and collected evidence therein. When he entered the bedroom, Lieutenant Godeaux noted that the sheets were not on the bed, but were crumpled into one corner of the bed; otherwise, there was no disarray to indicate that there had been a struggle. The sheets were collected as evidence. They appeared to be stained with feces and blood.

Lieutenant Godeaux testified that they also collected the nightgown B.F.J. had been wearing that morning. The sheets and the nightgown were sent to the Acadiana Crime Lab. After completing his physical investigation of the site, Lieutenant Godeaux arrested Defendant, transported him to the Mamou Police Department, and advised him of his rights. During booking, Defendant asked Lieutenant Godeaux, "How can a man rape his wife?" Lieutenant Godeaux explained to Defendant that once a woman said "no," it did not matter whether she was the man's wife.

3

Lieutenant Godeaux finished booking Defendant based on accusations of domestic abuse battery, aggravated rape, and criminal trespass.

Assistant Chief Richard was the second witness to testify at Defendant's trial. She testified that she had been at home, sleeping, when she was called about a possible rape. Lieutenant Godeaux was present when Assistant Chief Richard arrived at the scene, but B.F.J. was no longer there because she had left with the ambulance service. Assistant Chief Richard assisted Lieutenant Godeaux in stripping the bed and placing the sheets in an evidence bag. Assistant Chief Richard stated she was the one who transported the sheets, B.F.J.'s clothing, and the rape kit to the crime lab.

Lorena Marcantel, B.F.J.'s neighbor across the street, testified as the State's third witness. Mrs. Marcantel stated that she was not that well-acquainted with B.F.J. and did not visit with her or see her "that much." Mrs. Marcantel also stated that she was not well-acquainted with Defendant and seldom saw him visiting B.F.J.'s home.

Mrs. Marcantel related that, in the early morning of August 19, 2007, she awoke to B.F.J.'s terrible, horrible cry at her window. This frightened Mrs. Marcantel and caused her to believe something bad had happened. Mrs. Marcantel told her husband, Charles R. Marcantel, to wake up, and then she went to the window and peeped out. When she saw Defendant come onto their property, Mrs. Marcantel told her husband to get up out of bed. Mrs. Marcantel recalled that she called the police while her husband went outside. She stated that her son later went outside, but that she was too frightened to go outside immediately.

Mrs. Marcantel explained that, although it was dark, she thought that Defendant was naked at the time he came onto her property. She stated that she did not see B.F.J. at that time. Mrs. Marcantel went outside later when the police arrived

4

and saw and comforted B.F.J., who was standing under their carport. Mrs. Marcantel stated that she put her arms around B.F.J. because B.F.J. was crying in a scary, terrible, and creepy manner.

Charles G. Marcantel, the son of Lorena and Charles R. Marcantel, was the fourth witness to testify for the prosecution. He testified that he knew Defendant and knew B.F.J. a little, but that he did not often visit with them socially. Charles G. Marcantel stated that, on the morning of the incident, he heard banging on his window and that B.F.J. was yelling that Defendant was after her and that she needed to call the police. When he went outside, B.F.J. was standing under the Marcantel's carport "crying a lot," Defendant was standing at B.F.J.'s house, and "they" were looking for the knife. Charles G. Marcantel assisted in searching for the weapon. After the weapon was found, the police took Defendant away.

On further examination, Charles G. Marcantel explained that he had gone to the door when he first heard B.F.J. yelling and banging on the window. He reported seeing Defendant at B.F.J.'s house, on the sidewalk or at the steps of the sidewalk at that time. He stated that he thought Defendant had been wearing pants, but it was dark and he was not sure. Charles G. Marcantel also stated that he saw a glimpse of the knife.

Mr. Charles R. Marcantel, Lorena Marcantel's husband and Charles G. Marcantel's father, testified as the State's fifth witness. He testified that, on the morning of August 19, 2007, he was awakened by a lady hitting his house and yelling for help. When he got up and went to the door, he saw the city police on his lot. Mr. Marcantel stated that he knew Defendant and was able to identify him in court. He testified that Defendant was wearing clothes when he saw him that morning.

5

Although Mr. Marcantel did not recognize the voice calling for help, Mrs. Marcantel identified the voice as B.F.J.'s. The only time Mr. Marcantel ever saw Defendant at B.F.J.'s residence was that morning.

B.F.J. was the sixth witness to testify for the prosecution. She testified that she was still married to Defendant at the time of trial. B.F.J. stated that she had married Defendant in the summer of 2002, but that they had been separated. She testified that they had no children together, but that she had children from a prior marriage. After B.F.J. separated from Defendant in April 2007, Defendant moved into his mother's house while B.F.J. continued to rent their home. B.F.J. stated that, following their separation, she never visited with Defendant at his mother's home; however, Defendant would visit her at her house. She testified that she and Defendant occasionally still engaged in sex, but that he would not go to her house "that often," and they would not have sex every time he visited. B.F.J. testified that Defendant wanted to move back in, but that she did not encourage Defendant when he said he wanted to come home. B.F.J. explained that she left Defendant because "he was drinking and doing other stuff."

B.F.J. stated that she was home alone on the morning of the incident, asleep, and was awakened when Defendant turned on the light. B.F.J. did not know how Defendant had gotten into the house because he did not have a key. Defendant "had [a] knife in his hand[,] and he said[,] 'I came here because I want some in the but', [sic] for the last time." Defendant told B.F.J. he was going to kill her, but before he killed her, "he wanted some in the but [sic]." After telling B.F.J. this, Defendant began undressing. B.F.J. was wearing her nightgown and panties. B.F.J. identified the knife that Defendant had been holding as the one he wore on his belt at all times.

6

B.F.J. stated that the blade was exposed with Defendant holding the handle.

B.F.J. said that Defendant put the knife to her neck, picked up her nightgown, and ripped off her panties. He then made B.F.J. lay down before having anal sex with her. B.F.J. testified that he held the knife to her neck the entire time. B.F.J. stated that Defendant penetrated her for about an hour and, when he was done, he sat on the end of the bed. B.F.J. told Defendant that she needed to go to the bathroom to wipe. B.F.J. recalled that she had used a towel to clean herself because Defendant's actions had caused feces to leak from her body.

B.F.J. reported that, when she returned, Defendant was standing by the bed with the knife in his hand. This time, Defendant penetrated her vaginally. B.F.J. explained that she began "flattering" Defendant when he complained that she was not responding. She recalled that she had replied to Defendant's complaint by telling him that she was not responding because he was holding a knife on her, by asking him why he was doing this to her, and by saying that Defendant did not have to do those things. B.F.J. had covered the knife with a sheet and had been "flattering" Defendant to keep him from harming her or killing her. At some point, Defendant rolled off the bed and said, "my chest." B.F.J. grabbed the knife from the bed and ran out of the house. B.F.J. recounted that she then crossed a street and two ditches to get to the neighbor's house where she banged on the bedroom window and told them to call the police because Defendant was trying to kill her. B.F.J. said that she heard Defendant screaming for her to come back and that she saw him run out of the house with no clothes on. B.F.J. kept knocking on the window until Defendant grabbed her and dragged her across the street and through both ditches back onto her property. B.F.J. threw the knife into one of the ditches when Defendant began dragging her back

7

across the street. Defendant told her, "Oh bitch, I should had killed you in there." B.F.J. then resumed her attempts at "flattering" Defendant.

B.F.J. testified that, once they were back across the street, they went inside her house, where Defendant yelled at her, "[B]itch[,] I should [have] killed you." Defendant began looking in the kitchen utensil drawer, and B.F.J., fearing for her life, continued to flatter him. The police arrived, and Defendant moved toward the living room when he saw the lights flashing. When B.F.J. opened the door, the police officer asked where Defendant was. B.F.J. replied "on the sofa" and ran out of the house.

B.F.J. told the officer and a neighbor where she had thrown the knife and assisted in the ensuing search for the knife. She said that she did not fight Defendant because he had been holding the knife to her neck and that she was frightened and believed he was serious in his threat to kill her. B.F.J. stated that she did not want to have sex with Defendant and that she did not flatter Defendant until after he held the knife to her neck. B.F.J. testified that she had considered divorcing Defendant, but when she called to ask about it, she discovered she could not afford the proceedings.

On cross-examination, B.F.J. explained that the hour she said that Defendant had penetrated her was a total time which included several instances, off and on, lasting up to fifteen minutes each, over and over. B.F.J. clarified that she had not wrapped the knife in a sheet; rather, she had pulled the sheet over the knife. She stated that the situation made it difficult for her to remember exactly what had happened. B.F.J. testified that she remembered talking Defendant into putting the knife down, but she did not clearly remember whether she covered it with a towel or the sheet. While trying to remember more clearly, B.F.J. became upset and started

8

crying on the witness stand.

B.F.J. spontaneously stated that Defendant had tormented her. She related that she did not attempt to escape again after Defendant had her back inside her house because Defendant was near the door. B.F.J. reported that, although Defendant had previously used lubricant when they engaged in anal sex, he did not use any on that occasion.

When the defense asked B.F.J. about Defendant's visits and his giving her money, B.F.J. said that she would invite Defendant to her home, that he was there frequently, and that she would take any money he offered her to pay bills. B.F.J. did not recall going to the police station to give a statement, but she did recall speaking with an officer at the hospital. B.F.J. testified that, since his arrest, she had neither called nor visited Defendant. She also denied asking anyone about dropping the charges against Defendant.

The seventh witness to testify for the prosecution was Tina Roberie (Nurse Roberie), who was a registered nurse in the emergency room of Savoy Medical Center in Evangeline Parish. Nurse Roberie was working on the morning of August 19, 2007, when B.F.J. was brought in on a complaint that she had been raped by her husband from whom she had been separated. Nurse Roberie testified that B.F.J. told her that Defendant had broken into B.F.J.'s house and made her engage in both vaginal and anal sex with him. B.F.J. also informed Nurse Roberie that Defendant had been armed with a knife at the time and that she was scared, very upset, and crying.

Nurse Roberie said that she assisted Dr. Glen Bennett in performing a physical examination of B.F.J. Nurse Roberie stated there was no evidence of physical

trauma; however, feces were present around the anal area, and B.F.J. complained of pain in that area. Nurse Roberie assisted in both preparing the rape kit and in acting as a witness to the use of the rape kit. As part of the examination, Nurse Roberie collected and bagged B.F.J.'s nightgown. On cross-examination, Nurse Roberie clarified that she had seen neither bruising nor tearing during the examination.

Tren Landry, a forensic DNA analyst with the Acadiana Crime Lab, was the last witness to testify for the State during its case-in-chief. The trial court accepted Ms. Landry as an expert in forensic DNA analysis without objection by the defense. Ms. Landry examined the nightgown. It tested positive for blood, and there appeared to be feces present, but no seminal fluid. In order to positively identify the substance as feces, she stated that they would have needed to send the evidence to another location. Since the DNA analysis was completed only a week before trial, there was not enough time to have the garment tested to positively identify the substance as feces.

Ms. Landry also examined the bed sheets and stated that they, too, appeared to be marked with feces. As part of the rape kit, Ms. Landry examined vaginal, rectal, and oral swabs retrieved from B.F.J. Blood was present on both the oral and rectal swabs. The vaginal swabs were negative for blood and seminal fluid, but the vaginal slides were positive for spermatozoa. Ms. Landry analyzed the DNA and found that she could not exclude Defendant as the donor. She testified that the tests excluded 99.92 percent of the African-American population from the DNA profile. According to Ms. Landry, one out of 1,300 African-Americans could possibly have been a contributor of the DNA, and one out of 2,200 Caucasians could have possibly been a contributor of the DNA.

Ms. Landry found two DNA contributors to the samples found in the fingernail scrapings submitted with the rape kit. The major contributor was B.F.J.; however, there was insufficient information to draw any conclusions about the second contributor. Ms. Landry stated that, even with additional samples, she would not have had the time to complete the tests prior to trial.

L.R.J., Defendant's niece, was the first defense witness who testified at trial. L.R.J. stated that she had gone to the police station on the morning of the incident to pick up Defendant's personal items. L.R.J. said that she was waiting in the lobby when B.F.J. entered. L.R.J. testified that B.F.J. asked the officer on duty whether Defendant had any money in his wallet and said that she would do anything to help Defendant.

Defendant took the witness stand and testified that he was fifty-four years old, with an eighth grade education, and that he went to classes to learn how to operate heavy equipment. He confirmed that he had married B.F.J. in 2002 and that they had separated several months prior to the incident in 2007.

Defendant said he was a frequent visitor at B.F.J.'s house after their separation and that, although he sometimes showed up uninvited, he also went there upon B.F.J.'s invitation. He stated that he would bring B.F.J. food, that he would fix her car, and that he would occasionally mow her grass. Defendant explained that, during these visits, he and B.F.J. would sit and talk. Defendant maintained that they continued to engage in consensual sexual intercourse during their separation.

Defendant then described the events of August 19, 2007. Defendant stated that he arrived around nine o'clock pursuant to an invitation by B.F.J. During his visit, they sat, talked, watched a movie, ate popcorn, hugged, and kissed. Defendant

11

broached the subject of getting divorced if they were not going to reconcile because he was tired of giving her money. Defendant related that, since their separation, he had given B.F.J. $100.00 every Thursday and could no longer afford to give her the money.

Defendant asserted that he and B.F.J. retired to her bedroom after the movie ended where they made love. He recalled that they engaged in both anal and vaginal sex. Defendant testified that B.F.J.'s statements at the time made him believe the intercourse was consensual, and he denied holding a knife to her throat, threatening her harm, or telling her that he would kill her. He did not remember saying anything that would lead B.F.J. to believe that he wanted to kill or otherwise harm her. Defendant explained that the intercourse that evening was the same as always.

Defendant remembered having a chest pain and complaining to B.F.J. about it. He said that B.F.J. went to the bathroom to get a towel to clean themselves so he could leave, but she never returned. Defendant asserted that, after getting up and getting something to clean himself, he noticed the front door was open. After waiting for two or three minutes, Defendant, still naked, walked outside and saw B.F.J. in the neighbor's yard. He walked over to get her and brought her back inside her house.

Defendant reported that they talked for a short while when he saw police lights shining through the window. He asked B.F.J. why she called the cops, but she would not answer. She just told him that it would be all right. When the police knocked on the door, B.F.J. told him to stay in the back, that it would be all right, and that she would handle the situation. Defendant said the last thing B.F.J. told him was, "Don't worry about it." B.F.J. answered the door. Defendant remembered conversing with B.F.J. that evening and denied arguing with her. He maintained the sexual

12

intercourse had been consensual.

On cross-examination, Defendant admitted that the knife introduced into evidence was his, but he denied having any sort of knife with him that morning. Defendant declared that he had left the knife with B.F.J. to keep in her toolbox and use as a household tool. Defendant denied grabbing B.F.J. when he went to get her from the neighbor's yard. He reported that, at all times when B.F.J. was around him, she was perfectly calm and never appeared upset. Defendant said that B.F.J. left him because of his drinking and crack cocaine use.

Defendant contended that B.F.J. had him arrested because he refused to give her any more money. When the prosecutor pointed out that such a motivation would be foiled by Defendant being in jail continuously since his arrest, Defendant claimed that B.F.J. may have been more motivated by jealousy. Defendant asserted that the last thing B.F.J. told him was if "she couldn't have me[,] nobody else would." Defendant later amended his statement by stating that she had told him that when she left him in April 2007. Defendant also said that, with B.F.J., it was her way or no way at all and that she was a good actor when she wanted things to go her way.

**ERRORS PATENT**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there is a correction needed regarding the sentence.

The trial court correctly denied Defendant eligibility for diminution of sentence but cited the wrong legal authority in doing so. At sentencing, the trial court stated that it was denying Defendant eligibility for diminution of sentence in accordance with La.R.S. 15:571.3(C). The supreme court has stated that a trial judge lacks

13

authority under La.R.S. 15:571.3(C) to deny a defendant eligibility for diminution of sentence because that statute is directed exclusively to the Department of Corrections. *State v. Narcisse*, 97-3161 (La. 6/26/98), 714 So.2d 698. Thus, the trial court in the present case lacked authority to deny Defendant diminution of sentence under the statute cited.

However, since Defendant was convicted of forcible rape, a sex offense which is designated as a crime of violence, the trial court may deny Defendant diminution eligibility, but only under La.Code Crim.P. art. 890.1(B).[2] When imposing sentence upon Defendant in this case, the trial court stated the following:

> Specifically, the [c]ourt considered the extremely violent nature of this crime, the physical and psychological suffering that resulted, and the force involved. The [c]ourt is very concerned that, during a suspended sentence, additional violence might result and that a lessor [sic] sentence would deprecate the seriousness of the [D]efendant's crime.

Then the trial court sentenced Defendant as follows:

> The [c]ourt therefore imposes a sentence of [twenty-five] years at hard labor[,] with the first two years of said sentence to be without benefit of probation, parole, or suspension of sentence. Pursuant to [La.R.S.] 15:571.3[(C)], the [c]ourt finds and orders that diminution of the [D]efendant's sentence shall not be allowed. The [D]efendant's sentence has not been enhanced pursuant to any article or statute.

Although the trial court did not specifically state that the offense was a crime of violence, its reasons for sentence, as set forth above, clearly expressed its opinion that the offense was a crime of violence, and forcible rape is listed as a crime of

---

[2] Louisiana Code of Criminal Procedure Article 890.1(B) provides:

> Notwithstanding any provision of law to the contrary, if a person is convicted of or pleads guilty to a crime of violence as defined or enumerated in R.S. 14:2(B) and is sentenced to imprisonment for a stated number of years or months, the sentencing court may deny or place conditions on eligibility for diminution of sentence for good behavior unless diminution of sentence is prohibited by R.S. 15:571.3(C) or (D).

14

violence under La.R.S. 14.2(B)(13).  Hence, we find that the trial court exercised its discretion in denying Defendant diminution of sentence in accordance with La.Code Crim.P. art. 890.1(B).

Therefore, we amend Defendant's sentence to reflect that diminution of sentence is denied pursuant to La.Code Crim.P. art. 890.1 rather than La.R.S. 15:571.3.  *See State v. G.M.W., Jr.*, 05-391 (La.App. 3 Cir. 11/2/05), 916 So.2d 460.

**ASSIGNMENT OF ERROR NO. 1**

Defendant argues, "The evidence presented at trial, when viewed [in] a light most favorable to the prosecution, was insufficient to sustain the conviction."[3]  He asserts that, during his separation from B.F.J., they continued to see each other on a regular basis and maintained an ongoing sexual relationship.  Defendant urges that, even though he was not invited to the victim's home on the evening in question, the sex was consensual.  Defendant alleges that the victim made the rape accusation in retaliation for his comment that he was tired of giving her money.  He claims that the victim's testimony is "unreliable, untrustworthy, and incredible" in addition to being contradicted by the physical evidence.  Defendant contends that the jury also had problems with the victim's credibility as it returned the responsive verdict of forcible rape instead of finding him guilty as charged.

The State responds that the evidence is sufficient to prove forcible rape beyond a reasonable doubt and theorizes that the parties' prior consensual relationship was the reason why the jury returned a forcible rape conviction instead of an aggravated

---

[3]In its closing argument, the defense asserted that the State failed to meet its burden of proving that this Defendant had been armed with the knife because there was no fingerprint evidence proving that he had held the knife.  Defense counsel also claimed that the lack of bruising, cuts, or other injuries to B.F.J. meant that the intercourse had been consensual and, further, that Defendant had not been armed with the knife during sex.

15

rape verdict.

The supreme court has discussed the standard for reviewing sufficiency of the evidence claims:

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Mussall*, 523 So.2d 1305 (La.1988). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. *State v. Silman*, 95-0154 (La.11/27/95), 663 So.2d 27, 35. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. *State v. Bordenave*, 95-2328 (La.4/26/96), 678 So.2d 19, 20. It is not the function of an appellate court to assess credibility or re-weigh the evidence. *Id*.

*State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86.

Louisiana courts have previously discussed the extent to which a reviewing court may question credibility determinations made by the fact finder. "It is not the function of an appellate court to assess credibility . . . ." *Id*. at 1286. "The actual trier of fact's *rational* credibility calls . . . are preserved through the requirement that upon judicial review all of the evidence is to be considered as if by a rational fact finder in the light most favorable to the prosecution . . . ." *Mussall*, 523 So.2d at 1311 (citing *Jackson*, 433 U.S. 307, 99 S.Ct. 2781). "[T]he actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law." *Id*. at 1310 (citing *Jackson*, 433 U.S. 307, 99 S.Ct. 2781). "In the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the court, is sufficient to support a conviction or convictions." *State v. Stec*, 99-633, pp. 4-5 (La.App. 5 Cir. 11/30/99), 749 So.2d 784, 787.

16

When viewing the evidence in the light most favorable to the prosecution and when considering the circumstances and B.F.J.'s hysterical state at the time she gave her initial statement, B.F.J.'s trial testimony was not so inconsistent with her initial statement to such an extent that it would render the jury's determination that she was credible an irrational determination. The Marcantels, Lieutenant Godeaux, and Nurse Roberie all testified that B.F.J. was extremely distraught. Defendant's own self-serving testimony was the only evidence introduced at trial that would contradict a finding that B.F.J. was hysterical.

Moreover, B.F.J. admitted to regularly engaging in the same type of intercourse she reported having occurred during the rape, and she admitted that she did not resist Defendant once he pressed the knife to her neck. Instead, she stated that she chose to plead with Defendant, to humor him, and to flatter him; hence, there is no inconsistency in the absence of cuts and bruises. Also, B.F.J. testified that Defendant pressed the knife against her neck, back to front, so she would not have been able to tell whether the sharpened edge of the knife was pressing against her skin.[4] Additionally, Nurse Roberie stated that B.F.J. reported pain to her rectal area at the time of her exam and that there was blood present on the rectal swab, which would support B.F.J.'s statement that Defendant penetrated her anus without using a lubricant.

Thus, when the evidence is viewed in the light most favorable to the prosecution, B.F.J.'s testimony is not so internally inconsistent or in conflict with her prior statement, the trial testimony of the other witnesses, or the physical evidence,

---

[4]Although not part of the evidence, the prosecutor demonstrated during closing arguments that the knife blade was not sharp enough to cut. However, the knife was published to the jury, and those jurors who so desired were allowed to handle the weapon.

17

such that it would not support a finding by this court that the jury's credibility determination was irrational.

The Louisiana Legislature has set forth the following applicable definition for forcible rape:

> A. Forcible rape is rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:
>
> (1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.

La.R.S. 14:42.1. "The testimony of a sexual assault victim alone is sufficient to convict the defendant. Such testimony alone is sufficient even where the state does not introduce medical, scientific, or physical evidence to prove the commission of the offense by the defendant." *State v. Richard*, 39,705, pp. 4-5 (La.App. 2 Cir. 5/11/05), 902 So.2d 1271, 1274, *writ denied*, 05-1713 (La. 2/10/06), 924 So.2d 161 (citations omitted).

Because Defendant admitted to engaging in both vaginal and anal sexual intercourse with B.F.J. during the morning in question, the remaining issues before this court are the consensual nature of the sex and whether the victim was prevented from resisting by force or threats of physical violence under circumstances where she reasonably believed resistance would not prevent the rape. The victim's testimony in the instant case was that she did not want to have sex, but that she engaged in the act, without resisting, because Defendant threatened her life and held her at knife point.

In *State v. Cheeks*, 34,772 (La.App. 2 Cir. 6/20/01), 792 So.2d 789, the second circuit found sufficient evidence to support the defendant's forcible rape conviction.

18

The defendant and the victim had an "on again, off again" relationship; however, at the time of the offense, they were in an "off again" phase. *Id*. at 790. One evening, the defendant went to the victim's house to help put their children to bed. Afterward, the victim drove the defendant home because it was raining. When the victim spurned the defendant's requests to resume their relationship, the defendant struck the victim, threatened to beat her, and pulled her inside his house by her hair. Once inside, the defendant demanded that the victim disrobe and have sex with him. When she refused, the defendant grabbed a hunting knife and repeated his demand. The victim complied, and, sometime during the forced sex, the defendant lost possession of the knife. Feigning a need to use the restroom, the victim attempted to escape, but the defendant struck her again, dragged her back into the bedroom, and forced intercourse again.

In *State v. Williams*, 00-981 (La.App. 5 Cir. 4/11/01), 786 So.2d 805, *writ denied*, 01-1377 (La. 3/28/02), 812 So.2d 646, the fifth circuit found sufficient evidence to support the defendant's forcible rape conviction. The victim accompanied the defendant to an isolated area where she became nervous and attempted to leave. The defendant, who was armed with a knife, grabbed the victim, pushed her down on the ground, shoved the knife in her face, threatened to kill her if she screamed, and plunged the knife into the ground next to her head. The defendant then removed the victim's clothing and raped her. The victim attempted to flee at one point, but the defendant caught her, punched her, and raped her a second time.

In *State v. Trosclair*, 584 So.2d 270 (La.App. 1 Cir.), *writ denied*, 585 So.2d 575 (La.1991), the first circuit found sufficient evidence to support the defendant's

forcible rape conviction when the victim was raped at knife point even though the defendant challenged the victim's credibility on appeal. In *Trosclair*, the appellate circuit explained:

> Although the defendant was originally charged with aggravated rape, the jury found him guilty of the responsive offense of forcible rape. Nevertheless, this verdict indicates that the jury accepted the victim's testimony that she was forcibly raped at knifepoint, which was corroborated by the testimony of her son, and rejected the defendant's testimony that the act of sexual intercourse was consensual. On appeal, this [c]ourt will not assess the credibility of witnesses or reweigh the evidence to overturn a factfinder's determination of guilt.
>
> After a careful review of the record, we believe that a rational trier of fact, viewing all of the evidence as favorably to the prosecution as any rational factfinder can, could have concluded that the State proved beyond a reasonable doubt that the defendant was guilty of forcible rape.

*Id*. at 282 (citations omitted).

The evidence before this court in the instant case shows that Defendant threatened B.F.J.'s life while holding a knife and stated that he wanted sex before killing her. Defendant held the knife to B.F.J.'s neck while he removed her underwear, and he continued to hold the knife to her neck while he engaged in sexual intercourse with her. The evidence also shows that B.F.J. did not want to participate in the sexual activity and submitted thereto only because Defendant was holding a knife to her neck. This is supported by the evidence which indicates that B.F.J. escaped as soon as feasible, i.e., once both she and the knife were out of Defendant's physical control. Moreover, the record shows that, once Defendant regained physical control over B.F.J., he was able to pull her across two yards, two drainage ditches, as well as a street, and maneuver her back inside her house fairly quickly. Thus, when viewed in a light most favorable to the prosecution, the evidence shows beyond a reasonable doubt that Defendant engaged in both anal and vaginal intercourse with

20

B.F.J. without her consent and that he prevented her from resisting by threats of physical violence wherein B.F.J. reasonably believed that the resistance would not prevent the rape. *See* La.R.S. 14:42.1(A)(1).

Accordingly, this assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 2

Defendant contends, "The trial court erred in imposing an excessive sentence." He urges that the trial court failed to adequately follow the guidelines set forth in La.Code Crim.P. art. 894.1. Defendant claims that the trial court should have considered certain mitigating factors when sentencing him: (1) Defendant is fifty-four years old; (2) he has an eighth grade education; (3) he supported his wife financially during their separation; (4) there is no evidence that Defendant had any prior brushes with the law; and (5) Defendant maintained his innocence at all times. Based on the listed mitigating factors, as well as an allegation that Defendant is eligible for treatment programs addressing anger management and substance abuse, Defendant requests that this court find the imposed sentence to be excessive as being grossly out of proportion to the severity of the crime and a purposeless infliction of pain and suffering. Defendant further requests that this court vacate the imposed sentence and remand the matter for resentencing.

The prosecution responds, stating that the twenty-five-year sentence is less than two-thirds of the maximum possible sentence. The State further contends that the trial court adequately considered the La.Code Crim.P. art. 894.1 factors and that the record contains an adequate factual basis for the sentence.

"Whoever commits the crime of forcible rape shall be imprisoned at hard labor for not less than five nor more than forty years. At least two years of the sentence

21

imposed shall be without benefit of probation, parole, or suspension of sentence."

La.R.S. 14:42.1(B). Thus, Defendant's twenty-five-year hard labor sentence falls

within the statutory sentencing range.

This court has previously discussed the standard for reviewing excessive

sentence claims:

> [Louisiana Constitution Article 1], § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.

*State v. Barling*, 00-1241, 01-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035,

1042, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331 (citations omitted). "[T]he

trial judge need not articulate every aggravating and mitigating circumstance outlined

in art. 894.1[; however,] the record must reflect that he adequately considered these

guidelines in particularizing the sentence to the defendant." *State v. Smith*, 433 So.2d

688, 698 (La.1983).

In *State v. Lisotta*, 98-648, p. 4 (La.App. 5 Cir. 12/16/98), 726 So.2d 57, 58,

*writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183 (citing *State v. Telsee*, 425 So.2d

1251 (La.1983); *State v. Richmond*, 97-1225 (La.App. 5 Cir. 3/25/98), 708 So.2d

1272), the fifth circuit held that a reviewing court should consider three factors in

reviewing sentences imposed by the trial court: "1. the nature of the crime, 2. the

nature and background of the offender, and 3. the sentence imposed for similar crimes

by the same court and other courts."

22

In the instant case, the trial court issued written reasons for the penalty it imposed:

## SENTENCING OF [H.L.J.]

The court is called upon to sentence the [D]efendant, [H.L.J.], who was convicted by a jury of his peers of forcible rape. In arriving at a sentence, the court carefully considered the pre-sentence investigation report and all of the sentencing guidelines of [La.Code Crim.P. art.] 894.1. Specifically, the court considered the extremely violent nature of this crime, the physical and psychological suffering that resulted, and the force involved. The court is very concerned that, during a suspended sentence, additional violence might result and that a lesser sentence would deprecate the seriousness of the [D]efendant's crime. It is the opinion of the court that the [D]efendant is in need of correctional treatment and a custodial environment that can best be provided by his commitment to an institution.

The court therefor[e] imposes a sentence of [twenty-five] years at hard labor, with the first two years of said sentence to be without benefit of probation, parole, or suspension of sentence. Pursuant to [La.R.S.] 15:571.3([C]), the court finds and orders that diminution of [D]efendant's sentence shall not be allowed. Defendant's sentence has not been enhanced pursuant to any article or statute. Defendant is given credit for time served with regard to the crime for which he is sentenced today. Upon release or parole, [D]efendant must comply with [La.R.S.] 15:542 with regard to registration of sex offenders.

The court informs you that by virtue of [La.Code Crim.P. art.] 930.8 there is a two year prescriptive period for you to apply for post conviction relief which begins to run from the time of finality of judgment of conviction and sentence.

These are the same reasons that the trial court gave at the October 2, 2008 hearing.

Immediately after sentencing, the defense made an oral motion to reconsider the penalty imposed:

By Mrs. Tate: Your Honor, I'd like to make an oral Motion to Reconsider the Sentence for it being excessive given [Defendant's] age, he's [fifty-five] years old, in another [twenty-five] years he'll be almost [eighty] years old. He and the victim . . . were married for eight years and there is a history of, she does have a history of bringing some charges against the [D]efendant and then dropping the charges.

In response, the trial court denied the motion and gave oral reasons for its

decision:

> By the Court: And I don't know where [sic] that means he didn't do
> them, it means she just didn't proceed with the charges. It indicates that
> there [have] been problems all along and that culminated in a situation
> where she could have died. There was a knife involved in this and she
> was brutally attacked and . . . I respectfully decline your (inaudible).

In *State v. Vallery*, 04-1589 (La.App. 3 Cir. 4/6/05), 899 So.2d 836, this court affirmed a thirty-five-year sentence imposed on a forcible rape conviction. The defendant asserted that his sentence was excessive as he was a first-time offender. The defendant had been charged with aggravated rape for raping his eleven-year-old stepdaughter and using a knife in the commission of the crime, but he had pled guilty to forcible rape. This court found the defendant's argument to be without merit and noted that the facts would have fully supported an aggravated rape conviction which carries a mandatory penalty of life imprisonment.

In *State v. Jarrett*, 37,928 (La.App. 2 Cir. 12/10/03), 862 So.2d 440, the second circuit affirmed the maximum forty-year sentence for forcible rape. The fifty-two-year-old "victim awoke to find a man beside her on her bed telling her not to scream and to do whatever he said so she would not be hurt." *Id.* at 442. The victim testified that during the rape, she felt either a knife or some broken glass pressed against her. The sentencing court considered the defendant's prior criminal record, his status as a first felony offender and Navy deserter, the facts of the crime, his level of education, and his drug addiction in sentencing the defendant.

In *Williams*, 786 So.2d 805, the fifth circuit upheld a maximum sentence of forty years for a forcible rape conviction resulting from the defendant raping the victim twice. When the victim tried to escape, the defendant punched her in the face. The defendant also used a knife and death threats during the offense. The trial court

sentenced the defendant in accordance with similar cases, but without the benefit of a pre-sentence investigation report.

In *State v. Reaves*, 569 So.2d 650 (La.App. 2 Cir. 1990), *writ denied*, 576 So.2d 25 (La.1991), the second circuit affirmed a twenty-five-year sentence for forcible rape. The defendant, who was admitted into the victim's home on the pretext of needing to make a call, followed the victim into her bedroom where he held up a butcher knife and threatened to kill her if she shouted. The victim struggled, and the defendant cut her hand. The defendant, using the knife, ripped off the victim's clothing and raped her. When the victim called to report the incident, she was very upset, crying, and moaning. In sentencing the defendant, the trial court took into account the facts of the case, the defendant's lack of remorse, the fact that an aggravated rape had actually occurred, the psychological trauma to the victim, and the victim's fear of the defendant.

The record in the instant case shows that the trial court considered the following factors before imposing Defendant's sentence: the aggravating and mitigating factors set forth in La.Code Crim.P. art. 894.1; the facts of the case; the extremely violent and brutal nature of this offense; the physical and psychological suffering resulting from the crime; the force involved; the concerns both that, during a suspended sentence, additional violence might result and that a lesser sentence would deprecate the seriousness of Defendant's crime; the history of similar charges being filed and dropped against Defendant by the victim; and, the use of a dangerous weapon during the offense. Considering the nature of the offense, the evidence in the record, the background of Defendant, and the penalties imposed in similar cases, we do not find Defendant's sentence excessive.

Accordingly, this assignment of error is without merit.

## DISPOSITION

Defendant's conviction and sentence are affirmed. Defendant's sentence is amended to reflect that diminution of sentence is denied pursuant to La.Code Crim.P. art. 890.1(B), and the trial court is instructed to note the amendment in the court minutes.

**AFFIRMED AS AMENDED WITH INSTRUCTIONS.**