# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**09-846**


**STATE OF LOUISIANA**

**VERSUS**

**LEONARD LEWIS**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT
PARISH OF VERNON, NO. 67408
HONORABLE JAMES RICHARD MITCHELL, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**JOHN D. SAUNDERS**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Marc T. Amy, and J. David Painter, Judges.

**AFFIRMED.**

**Hon. William E. Tilley**
**District Attorney - 30th JDC**
**P.O. Box 1188**
**Leesville, LA 71496-1188**
**(337) 239-2008**
**Counsel for Plaintiff/Appellee:**
**State of Louisiana**


**James Edward Beal**
**LA. Appellate Project**
**P. O. Box 307**
**Jonesboro, LA 71251-0307**
**(318) 259-2391**
**Counsel for Defendant/Appellant:**
**Leonard Lewis**

**Terry Wayne Lambright**
**Attorney at Law**
**100 S. Third St., Suite A**
**Leesville, LA 71446**
**(337) 239-6557**
**Counsel for Plaintiff/Appellee:**
**State of Louisiana**


**Leonard Lewis**
**Louisiana State Penitentiary**
**TU-U/L-C11**
**Angola, LA 70712**
**Counsel for Defendant/Appellant:**
**Leonard Lewis**

**SAUNDERS, Judge.**

**FACTS AND PROCEDURAL HISTORY:**

On the night of November 2, 2004, the Defendant, Leonard Lewis, is alleged to have killed two men, James Smith and Edward Jones. The alleged offense occurred at 212 and 218 B&G Loop in Vernon Parish. Smith and his stepson, Jones, were out that night celebrating Jones' birthday. After a night out celebrating, Smith and Jones went to the residence of Jeremy Blanchard, who lived next door to the Defendant.

Upon arriving at Blanchard's residence, Jones exited the vehicle and spoke to Blanchard and confronted him over a crime that he had been accused of but did not commit. After the exchange with Blanchard, Jones saw the Defendant standing in the doorway of Blanchard's trailer. He approached the Defendant and was pushed back. When he approached again, the Defendant pulled out a sawed off shotgun and shot and killed Jones. He then turned the gun on Smith. The murders were first reported to police by Sheila Glover, the aunt of Blanchard.

On December 6, 2004, the Defendant was charged in an indictment with two counts of first degree murder, in violation of La.R.S. 14:30. The Defendant entered a plea of not guilty to both counts on December 21, 2004.

On October 19, 2005, the Defendant filed an "Application for Appointment of Sanity Commission and Motion to Enter Plea of 'Not Guilty and Not Guilty by Reason of Insanity.'" The Defendant filed a motion for sanity hearing on May 15, 2006. On August 23, 2006, the trial court found the Defendant competent to stand trial. On November 9, 2006, the State filed a notice of intent to seek the death penalty.

On January 3, 2008, the Defendant filed a "Motion to Modify Plea From Not Guilty to Not Guilty by Reason of Insanity Plea." The motion was granted on January 4, 2008.

The State informed the trial court on April 28, 2009, that it was no longer seeking the death penalty. At that time, the Defendant waived his right to trial by jury. A bench trial commenced on May 11, 2009. On May 14, 2009, the Defendant was found guilty on both counts. A Motion for Post-Verdict Judgment of Acquittal and Motion for New Trial were filed on May 22, 2009, and denied on May 26, 2009.

On May 26, 2009, the Defendant was sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence on each count, to run consecutively. A motion to reconsider sentence was filed and denied. A motion for appeal was also filed and granted.

The Defendant is now before this court asserting several assignments of error.

**APPELLANT'S ASSIGNMENTS OF ERROR:**

1) The Defendant did not make a knowing and intelligent waiver of his right to jury trial.

2) The record does not indicate that the indictment was signed by the foreperson of the grand jury.

*Pro Se* Assignments of Error:

1) The State leveled charges of the cause of death and manner of death of Edward Jones in its opening statement at the trial on the merits and failed to prove the charges it made as to the cause and manner of Edward Jones's death.

2) A warrant to seize a shotgun was served without authorization at the Defendant's home at night.

3) The trial court admitted as evidence the shotgun seized by warrant and served at night without authorization over the objections of the defense at the trial on the merits as the purported murder weapon.

4) Both the Defendant and defense counsel raised the issue of conflict

of interest between client and counsel prior to the trial, by motions and again in open court prior to the trial on the merits, and the trial court refused to look into the matter to determine if a conflict of interest existed.

5) The trial court cancelled a hearing already in progress on conflict of interest and withdrawal of counsel, denying the Defendant his right to represent himself and ordering counsel to continue to represent and refused to determine if a conflict of interest existed.

6) At the same hearing, the trial court refused to allow the Defendant to represent himself, denying a substantial and constitutional right.

7) At the trial on the merits, the Defendant was refused admission of a custodial statement made on November 11, 2004, which was offered for the purpose of relevancy to the Defendant's state of mind, which was material to his plea of not guilty by reason of insanity.

8) The trial court admitted evidence from two ex parte civil mode of procedure examinations intended for use in a criminal proceeding.

9) The examinations were a form of "marion" civil procedural examination intended for use in a criminal proceeding and are outlawed for use in a criminal proceeding.

10) The trial court refused to allow a witness to the ex parte examinations intended for use in a criminal proceeding and refused to ensure that a verbatim record of the proceedings was allowed or kept or made.

11) By the appellate record in the case, Jeremy Blanchard, [the] co-indicted co-defendant, was not severed from the indictment in case 67408 prior to the trial on the merits.

12) If Blanchard was severed prior to trial, the Defendant's indictment was not amended, leaving a defect of substance. Further, neither the short form indictment nor the warrants informed the Defendant of the cause or nature of any capital prosecution.

13) The State exceeded the time limitations allowed by statute to convene and commence the trial on the merits.

14) The State failed to establish that it commenced the trial timely and that it did not improperly exceed the time limitations as required by statute.

15) The Defendant was prejudiced by his inability to argue the matter of limitations due to imposed counsel.

16) The trial court allowed the faulty time calculations of the State, which was an abuse of discretion, and unjustly prejudiced the Defendant's cause in the matter of time calculations and tolling the time periods.

17) The Defendant was entitled to a dismissal for the State failing to commence the trial timely and impermissibly exceeding the time limitations without authorized delay for the State.

18) The State, by the record, failed to establish that its purpose in seeking the death penalty was not for the purpose of evading the statutory time limitations.

19) There was an operational bar to the State proceeding to trial which existed until after the State had impermissibly exceeded the time limitations.

20) The trial court impermissibly relaxed the State's burden of proof in calculating time calculations for time limits by allowing in prejudicial error, the State's faulty calculations.

21) The State's improperly allowed faulty arguments on time calculations charged the Defendant in error for delays in the case.

22) The trial court's action at the hearing on the motion to quash in allowing the State impermissibly to charge the Defendant for delays and allowing the State impermissible calculations, forced him to share the State's interest in its legal burden and relaxed its burden, necessitating a new judicial hearing on exceeding the time limitations.

23) The trial court refused to admit the Defendant's statement of 11/11/04 offered for the purpose of the Defendant's state of mind and mental state relevant to his plea of not guilty by reason of insanity, violating constitutional provisions.

24) The trial court refused to admit the Defendant's videotaped statement for his offered purpose relevant to his material state of mind or mental state, admitted evidence obtained from two ex parte "marion" civil procedural mode examinations, and failed to prove he was not insane at the time period of alleged offenses beyond a reasonable doubt.

25) The State charged the manner and cause of death of Edward Jones in its opening statement and failed to prove those charges made at the trial on the merits during trial.

26) Contradictions and internal contradictions in the testimony of purported co-indicted witness, Jeremy Blanchard, existed and barred a conviction in the case.

27) The accounts and testimony forced the finder of fact to speculate to reach the verdict due to internal contradictions, fabrications, lies, misrepresentations, and perjuries of witnesses.

28) There was insufficient evidence to convict once the inadmissible evidence is weeded out, and the admissible evidence is included.

29) The State failed to rebut or negate a valid defense hypothesis presented at trial.

30) Ineffective assistance was rendered by counsel.

31) Counsel's representation was not competent.

32) The Defendant was denied constitutional assistance of counsel.

33) The court exceeded its jurisdiction by denying the Defendant the right to represent himself at trial and contravened federal law and U.S. Supreme Court rulings.

34) The Defendant could not give a waiver of right to a jury trial in the current case.

35) The Defendant did not tender a knowing and intelligent waiver to a right to a jury trial.

36) The record does not show the indictment in the case was signed by the grand jury foreman.

*Pro Se* Supplemental Assignments of Error:

1) The Defendant was allowed to waive the right to trial by jury while the case was still capital.

2) The trial court denied the Defendant the constitutional right to represent himself.

3) The evidence was insufficient to prove beyond a reasonable doubt the State's opening charges concerning the cause and manner of death of Edward Jones.

4) SKIPPED.

5) The trial court allowed a shotgun to be introduced into evidence which was seized at night and without authorization as required by law.

6) The State failed to rebut or negate the hypothesis that Jeremy

Blanchard committed the offenses and merely blamed the Defendant to avoid criminal liability.

7) The Defendant was denied a constitutional level of representation and trial counsel provided ineffective assistance and violated the Defendant's rights.

8) No defense of insanity was prepared although the Defendant entered a plea of not guilty and not guilty by reason of insanity.

9) The Defendant was denied adequate development of his defenses due to unavailability of funds to do so.

10) The accounts and testimony of the purported witness Jeremy Blanchard contained internal inconsistencies, contradictions, perjuries, lies, misrepresentations and fabrications, and logical inconsistencies.

11) The prosecution allowed the State's witness to use false testimony at trial and did not correct the error.

12) The State failed to prove beyond a reasonable doubt in the case of Edward Jones that the homicide was not justified under provisions of La.R.S. 14:20.

**LAW AND DISCUSSION ON THE MERITS:**

Before we begin our discussion of the Defendant's numerous assignments of error, we note that an error patent review was completed by this court. We found that there was no error patent present. The substance of that review is mirrored below in our discussion of *pro se* assignment of error number 34 and supplemental *pro se* assignment of error number 1.

<u>*PRO SE* ASSIGNMENT OF ERROR NO. 34; SUPPLEMENTAL BRIEF *PRO SE* ASSIGNMENT OF ERROR NO. 1</u>:

The Defendant argues that a trial by jury could not have been waived in favor of a bench trial. He urges that the trial must be treated as a capital case, regardless of whether the State was seeking the death penalty. We disagree.

The Defendant was charged with two counts of first degree murder in December of 2004. He entered a plea of not guilty to both counts. In November of

-6-

2006, the State filed a notice of intent to seek the death penalty.

The Defendant later filed a motion to modify his plea from not guilty to not guilty by reason of insanity. In April of 2009, the State informed the Defendant that it was no longer seeking the death penalty. At this time, the Defendant waived his right to trial by jury.

At a bench trial in May of 2009, the Defendant was found guilty on both counts of first degree murder. He was sentenced to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence on each count, to run consecutively.

In addressing the Defendant's argument, we will first note the relevant constitutional and statutory language:

Louisiana Constitution Article 1, § 17 (A):

> A criminal case in which the punishment may be capital shall be tried before a jury of twelve persons, all of whom must concur to render a verdict. . . . Except in capital cases, a defendant may knowingly and intelligently waive his right to trial by jury.

Louisiana Code of Criminal Procedure Article 780:

> A. A defendant charged with an offense other than one punishable by death may knowingly and intelligently waive a trial by jury and elect to be tried by a judge . . .

Louisiana Code of Criminal Procedure Article 782 (emphasis added):

> A. Cases in which punishment may be capital shall be tried by a jury of twelve jurors, all of whom must concur to render a verdict. Cases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict. Cases in which the punishment may be confinement at hard labor shall be tried by a jury composed of six jurors, all of whom must concur to render a verdict.
>
> B. Trial by jury may be knowingly and intelligently waived by the defendant except in capital cases.

Louisiana Revised Statutes 14:30 (amended in 2007)(emphasis added):

C. Penalty provisions.

(1) If the district attorney seeks a capital verdict, the offender shall be punished by death or life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, in accordance with the determination of the jury. The provisions of C.Cr.P. Art 782 relative to cases in which punishment may be capital shall apply.

(2) If the district attorney does not seek a capital verdict, the offender shall be punished by life imprisonment at hard labor without the benefit of parole, probation or suspension of sentence. The provisions of C.Cr.P. Art 782 relative to cases in which punishment is necessarily confinement at hard labor shall apply.

The amendments to La.R.S. 14:30 came after the commission of the murders but prior to the Defendant's bench trial. Our determination on this issue turns on whether the law should be applied as of the time of the trial or as of the time of the commission of the crime. If we use the applicable law as of the time of the Defendant's trial, the amendment to La.R.S. 14:30 would apply. In this case, because the State did not pursue the death penalty, the Defendant would not be punished as a capital offender under C.Cr.P. Art 782, thus allowing him to waive his right to trial by jury. However, if the applicable law is as of the time of the commission of the crime, the procedural protections afforded in capital cases must apply, and the Defendant must be given a trial by jury.

Currently there is no relevant jurisprudence addressing the amendment to La.R.S. 14:30. However, a similar amendment was made in 1997 to La.R.S. 14:42 applicable to cases of aggravated rape of a child under the age of twelve. Case history directed to that amendment sufficiently addresses the present matter.

The law on this issue is in flux, with multiple cases being decided in each direction. We find that the proper course of action is to affirm the determination by

the trial court.

In *State v. Carter*, 362 So.2d 510, (La.1978), our supreme court addressed a misjoinder issue in an aggravated rape case, which at the time of the crime's commission was a capital offense. Addressing the mode of trial and how the requirements were altered by a 1977 Amendment, the court stated, "[a] procedural change which does not affect an accused's substantive rights in the prosecution of a criminal offense is applicable to the trial of the offense after the effective date of the change even though the particular offense was committed prior to that date." *Id.* at 513. When comparing the amendment in *Carter* to the change made to La.R.S. 14:30, that opinion is directly on point with the issue facing this court.

It should be noted, however, that there have been multiple cases since *Carter* that have disagreed with that opinion and come to differing conclusions. Most notably, these include: *State v. Rich*, 368 So.2d 1083 (La.1979), *State v. Williams*, 372 So.2d 559 (La.1979), and *State v. Breaux*, 08-1061 (La.App. 3 Cir. 4/1/09), 6 So.3d 982—all addressing aggravated rape issues.

*State v. Schrader*, 518 So.2d 1024 (La.1988), *cert. denied*, 498 U.S. 903, 111 S.Ct. 265(1990), is a first degree murder case where the supreme court addressed another procedural protection for capital crimes. An error patent review discovered that the jury had not been sequestered even though the charge was classified as a capital offense. The court held:

> We now hold, despite its long lineage, the jurisprudential presumption of prejudice for "capital cases" does not apply to a "capital case" where the defendant never faced the prospect of the death penalty and where counsel failed to press the point in the trial court, or object to the lack of sequestration. In the absence of actual prejudice, this right to sequestration is waived.

*Id.* at 1037.

In the case presently before us, as in *Schrader*, the Defendant was not faced with the prospect of the death penalty, nor was he prejudiced by not being afforded a jury trial. Conversely, it was by his request that he was given a bench trial.

*State v. Marcantel*, 98-825 (La.App. 3 Cir. 12/22/99), 756 So.2d 366, *writ denied*, 00-208 (La. 8/31/00), 766 So.2d 1274, is a case involving the aggravated rape of a victim under the age of twelve. As in *Schrader*, it addresses an error patent review for not sequestering jurors—a procedural protection for capital crimes akin to the right to a jury trial. Again, the court found that because the defendant was not exposed to the risk of the death penalty, did not object to the lack of sequestration, and did not show that he was prejudiced by not having the jury sequestered, the right was waived. Again, this is consistent with the facts of the case now before us.

Our fifth circuit, in *State v. Kinsel*, 00-1610 (La.App. 5 Cir. 3/28/01), 783 So.2d 532, *writ denied*, 01-1230 (La. 3/28/02), 812 So.2d 641, adopted an approach similar to that of the above cases. This was an aggravated rape case that addressed the amendment to La.R.S. 14:42 (a nearly identical amendment to La.R.S. 14:30 which we are addressing in the present matter). In *Kinsel*, as in the present matter, the State was not seeking the death penalty, and the amendment was made after the commission of the crime but before trial. The court held:

> Although LSA-R.S. 14:42 D(2)(b) was not in effect at the time that defendant committed the alleged offenses, it had been enacted prior to the time of defendant's trial. We find this procedural provision applicable to the instant case. As a result, the provisions of C.Cr.P. art. 782 were properly triggered when the state did not seek the death penalty. Accordingly, we find that the trial court did not err in failing to require a unanimous verdict for defendant's aggravated rape conviction.

*Id*. at 539. It should be noted that *Kinsel* neither cited *Carter* in support of its decision nor *Rich* or *Williams* in opposition.

Along with the above stated cases, we also find significant this court's decision in *State v. Holley*, 01-254 (La.App. 3 Cir. 10/3/01), 799 So.2d 578. Again, this was an aggravated rape case. Upon the state announcing that it would not seek the death penalty, the defendant waived his right to a trial by jury. Research suggested that the amendment to La.R.S. 14:42 removed the case from the realm of capital cases, and, thus, it allowed for the defendant to waive his right to a jury trial. We agree that this was the right decision, and we feel that the same logic still applies today.

For the foregoing reasons, we find that the Defendant's right to trial by jury was properly waived.

## *PRO SE* ASSIGNMENTS OF ERROR NO. 26, 27, 28, & 29; SUPPLEMENTAL *PRO SE* ASSIGNMENTS OF ERROR NO. 6, 10 & 11:

In his twenty-sixth *pro se* assignment of error, the Defendant contends contradictions and internal contradictions in the testimony of Jeremy Blanchard existed and barred a conviction in the case. In his tenth supplemental *pro se* assignment of error, the Defendant contends the accounts and testimony of Jeremy Blanchard contained internal inconsistencies, contradictions, perjuries, lies, misrepresentations, fabrications, and logical inconsistencies.

In his twenty-seventh *pro se* assignment of error, the Defendant contends the accounts and testimony forced the fact finder to speculate to reach a verdict due to the internal contradictions, fabrications, lies, misrepresentations, and perjuries of witnesses.

In his twenty-eighth *pro se* assignment of error, the Defendant contends there was insufficient evidence to convict him once the inadmissible evidence is weeded out from the admissible evidence. The Defendant asserts that after inadmissible and admissible evidence has been settled, this court has no option other than to find him

-11-

not guilty by reason of insanity in the case of James Smith, dismiss the case of Edward Jones, and order a new trial in the case of James Smith.

In his twenty-ninth *pro se* assignment of error and sixth supplemental *pro se* assignment of error, the Defendant contends the State failed to rebut a valid defense hypothesis that Jeremy Blanchard committed the offenses and merely blamed the Defendant to avoid criminal liability.

In his eleventh *pro se* supplemental assignment of error, the Defendant contends the State allowed its witness to use false testimony at trial and did not correct the error.

The Defendant addresses *pro se* assignments of error twenty-six, twenty-seven, twenty-eight, and twenty-nine collectively. Thus, we will do the same. Supplemental *pro se* assignments of error six, ten, and eleven will also be addressed at this time. Further, we will address these assignments of error, which pertain to the sufficiency of the evidence, out of order as instructed by *State v. Hearold*, 603 So.2d 731 (La.1992).

Sufficiency of the Evidence/Perjuries, Lies, and Misrepresentations

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Mussall*, 523 So.2d 1305 (La.1988). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. *State v. Silman*, 95-0154 (La.11/27/95), 663 So.2d 27, 35. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. *State v. Bordenave*, 95-2328 (La.4/26/96), 678 So.2d 19, 20. It is not the function of an appellate court to assess credibility

or re-weigh the evidence. *Id.*

> *State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86.

> Louisiana courts have previously discussed the extent to which a reviewing court may question credibility determinations made by the fact finder. "It is not the function of an appellate court to assess credibility. . . ." *Id.* at 1286. "The actual trier of fact's *rational* credibility calls . . . are preserved through the requirement that upon judicial review all of the evidence is to be considered as if by a rational fact finder in the light most favorable to the prosecution . . . ." *Mussall*, 523 So.2d at 1311 (citing *Jackson*, 443 U.S. 307, 99 S.Ct. 2781). "[T]he actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law." *Id.* at 1310 (citing *Jackson*, 443 U.S. 307, 99 S.Ct. 2781). "In the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the court, is sufficient to support a conviction or convictions." *State v. Stec*, 99-633, pp. 4-5 (La.App. 5 Cir. 11/30/99), 749 So.2d 784, 787.

*State v. H.L.J.*, 08-1070, p. 16 (La.App. 3 Cir. 4/1/09), 6 So.3d 997, 1007.

The Defendant asserts that Blanchard's trial testimony differed from what he told police in the statement he gave on November 9, 2004. The Defendant further asserts that the statement he himself gave on November 11, 2004, corroborates the order of events as set forth in Blanchard's statement of November 9, 2004. The Defendant contends that in his statement, Blanchard said it was dark when evidence was disposed of at Toledo Bend Raceway and that he did not throw any body parts into the river. However, at trial, Blanchard testified that he and the Defendant left the Toledo Bend Raceway before dark and he threw the severed arm of Jones into the water. The Defendant also asserts that Blanchard's "pretense of nonparticipation" was a fabrication and misrepresentation. The Defendant further asserts the State knew or was legally required to know the contents of Blanchard's sworn recorded statements and was legally obligated to correct errors of false testimony when it occurred. The Defendant goes on to discuss Blanchard's testimony regarding

Edward Jones's demeanor. The Defendant contends that Jones, one of the victims, was angry with Blanchard, but Blanchard testified that he and Jones were on good terms. The Defendant asserts this was "merely a transparent attempt to absolve Mr. Blanchard of the malice which existed and thus by self exoneration [sic] erase any motive for Blanchard shooting Edward Jones and James Smith whether in self defense or not upon analysis this is not merely an unlikely event it is highly improbable." The Defendant asserts the trier of fact was forced to speculate that no bias existed between himself and Blanchard and that Jones was on good terms with Blanchard and only angry with the Defendant. The Defendant further asserts that Blanchard testified that he told Lisa Bernard that he would stab Jones. He then asserts that no rational trier of fact would believe Blanchard. The Defendant contends that Blanchard was in the trailer on the night in question and merely accused him to avoid life imprisonment or execution.

The Defendant next contends that there were inconsistencies in Sheila K. Glover's statement. Further, the Defendant contends that defense counsel had a signed statement which placed Blanchard in a line of sight where he could see inside the trailer, "a conclusive indication of Jeremy Blanchard's misrepresentation and fabrication comes at the point where he directly denies the conflict he had with Edward Jones earlier the day Jones was shot when Blanchard threatened to 'stick' (stab) Edward Jones."

The Defendant contends that in many jurisdictions, Blanchard would be an incompetent witness because he is a convicted felon, had an interest in the outcome of trial, and admitted malice between himself and the Defendant. The Defendant further contends that Blanchard committed perjury during trial. Based on the

Defendant's allegations, he states that the presumption that Blanchard was telling the truth was negated.

The Defendant sets forth purported perjuries committed by Blanchard. On cross-examination, Blanchard testified as follows:

> Q. Tell me with whom you have spoken in preparing for your statement today - - your testimony today?
>
> A. I spoke with no one. My Lawyers don't even communicate with me for a long time.
>
> Q. I can't speak for anybody except myself on that. You didn't speak with the District Attorney about this?
>
> A. No.
>
> . . . .
>
> Q. When was the last time that you spoke with any law enforcement official or any prosecutor about your giving testimony?
>
> A. Today. Here in Court today.
>
> Q. Before today?
>
> A. None at all.
>
> Q. Well, obviously you had to - - there had to have been a discussion with law enforcement officials because you entered into an agreement about your testimony which you testified to a little while earlier, you would do certain things and they would do certain things, so, obviously at some point you had to have a conversation with someone about this testimony.
>
> A. Of course, three years ago.
>
> Q. Fair enough. So, just so I'm sure we are on the same page you haven't talked to anyone in law enforcement or any prosecutor in the last three years or so about the testimony you were going to give today?
>
> A. Right.

On redirect, Blanchard was questioned as follows:

> Q. Jeremy, you were asked before your testimony if you had ever talked

to a prosecutor, do you remember Sunday night talking to myself asking you questions about this case, this past Sunday night at the District Attorney's Office?

A. Yeah.

Q. Did you, likewise, talk to Mr. Strider at the District Attorney's Office this past Sunday night?

A. I did.

Q. So, when you were asked about a prosecutor you know that Mr. Strider and I are prosecutors?

A. Yes.

The following occurred on recross:

Q. Do you remember when I asked you when we started this not to answer any question you didn't understand, right?

A. I do remember that.

Q. I asked you did you talk to the police or did you talk to the - - when was the last time you talked to the prosecutors, right? You recall that and you understood when I asked you that, right?

A. Yes.

Q. But, even though I asked you that and you understood that you told me you hadn't talked to the prosecutors since years ago when, in fact, the truth is you talked to them two days ago?

A. Yes.

Q. You chose to tell me that?

A. Yeah, I chose to tell you that.

We find the statement made by Blanchard on November 9, 2004, made by the Defendant on November 11, 2004, and any statement made by Glover were not admitted into evidence at trial. Further, we have reviewed the testimony of Blanchard, and he did not testify about the contents of his statement. Glover testified that she spoke to Liberty County police and told them everything she knew.

We further note that the Defendant makes no reference to the volume or page in the record where the contents of the statements at issue were discussed. Because these statements were not introduced into evidence at trial, they cannot be considered by this court. *State v. Gann*, 07-459, (La.App. 3 Cir. 10/31/07), 969 So.2d 690, *writ denied*, 08-335 (La. 10/31/08), 994 So.2d 528.

The Defendant does not assert the State failed to prove an element of the offenses. He merely asserts that Blanchard's testimony is not credible. We have considered the Defendant's argument in light of Blanchard's testimony at trial.

Blanchard, the only eyewitness to the events at issue, testified that he rented from the Defendant and lived next door to him. On the date in question, he was awakened by the phone at approximately 2:00 a.m. At that time, the Defendant was inside Blanchard's residence. Blanchard eventually dozed back off and was awakened by the Defendant, who stated someone was coming.

Blanchard got out of bed and saw a truck drive up. He testified that he "kept standing there" until Smith got out of the vehicle and said, "hello Blanchard boys." Blanchard then testified that he was walking outside when Smith made this remark. When Blanchard encountered Smith, he shook Smith's hand.

Jones was with Smith and Jones's right arm was in a cast. When Blanchard tried to speak to Jones, Jones was calling the Defendant names. Blanchard told Jones he was ugly and Jones said, "I'm fixing to go to Court, this ain't right, I didn't take nobody's tools." Jones appeared to be mad. At that time, the Defendant was inside Blanchard's residence and neither Blanchard nor Jones could see the Defendant. Jones then began to go up the steps and asked the Defendant, who was still inside the residence, why he would not come outside. Blanchard testified that Jones was

attempting to enter the residence.

The Defendant either pushed or kicked Jones down the steps. Jones then started going back up the steps again. The Defendant then said, "don't run up on me," and pushed or kicked Jones down the steps again. Jones attempted to go up the steps a third time and Blanchard heard a loud bang. Blanchard saw "red fire" come out of the end of a gun barrel and Jones fell to the bottom of the steps. Jones was not more than a foot and a half from the end of the gun barrel when he was shot.

The Defendant subsequently ran into the yard toward Smith, who began to move backwards and fell over a pile of wood. The Defendant then leaned over Smith and shot him.

Blanchard testified that Jones did not have anything in his hands during this sequence of events. Further, he never saw Jones touch the Defendant.

Blanchard testified that the Defendant showed him a knife after the incident, but he was not sure where the Defendant got the knife. We also note that Daniel Holland testified that while he was incarcerated, he overheard the Defendant say he shot two men and then cut them up. Sheila Glover, Blanchard's aunt, testified that Blanchard told her two people had been killed, and he did not indicate that he had committed the murders.

It appears that the judge was aware of any inconsistencies in Blanchard's testimony, but chose to believe the testimony that the Defendant was the person who killed Jones and Smith. As noted in the cases cited earlier, this court will not second guess that credibility determination. Accordingly, we find that the evidence presented by the State supports the Defendant's convictions.

In his supplemental *pro se* brief, the Defendant asserts that no evidence was

introduced by the State to combat or rebut the defense hypothesis that Blanchard committed the offenses. He asserts that by law, if a defense is not rebutted, it has not been shown or proven beyond a reasonable doubt that he committed the offenses.

> The statutory rule in evaluating the sufficiency of circumstantial evidence is, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La.R.S. 15:438. The Louisiana Supreme Court has explained the "hypothesis of innocence" stating:
>
>> Consequently, before a trier of fact can decide the ultimate question of whether a reasonable hypothesis of innocence exists in a criminal case based crucially on circumstantial evidence, a number of preliminary findings must be made. In addition to assessing the circumstantial evidence in light of the direct evidence, and vice versa, the trier of fact must decide what reasonable inferences may be drawn from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled or compromised; and the weight and effect to be given to each permissible inference. From facts found from direct evidence and inferred from circumstantial evidence, the trier of fact should proceed, keeping in mind the relative strength and weakness of each inference and finding, to decide the ultimate question of whether this body of preliminary facts excludes every reasonable hypothesis of innocence.
>
> State v. Chism, 436 So.2d 464, 469 (La.1983). A reviewing court does not determine whether a hypothesis offers the defendant an exculpatory explanation of the event; rather, the reviewing court evaluates "evidence in the light most favorable to the prosecution, determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under Jackson [443 U.S. 307, 99 S.Ct. 2781]." State v. Davis, 92-1623, p. 11 (La.5/23/94), 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994).

State v. Johnson, 09-231, pp. 6-7 (La.App. 3 Cir. 11/4/09), 21 So.3d 1159, 1164.

We again note that the trial court heard Blanchard's testimony and the Defendant's argument that Blanchard committed the offenses at issue. The trial court chose to believe the Defendant committed the offenses at issue.

-19-

The Defendant finally argues that he must be found not guilty by reason of insanity for the death of Smith. The Defendant failed to present any argument regarding this claim and fails to reference the record. Thus, this claim will not be addressed by this court. Uniform Rules—Courts of Appeal, Rule 2-12.4.

SUPPLEMENTAL BRIEF *PRO SE* ASSIGNMENT OF ERROR NO. 12:

In his twelfth *pro se* supplemental assignment of error, the Defendant contends the State failed to prove beyond a reasonable doubt that the homicide of Edward Jones was not justified under the provisions of La.R.S. 14:20. We will address this assignment out of order, as it relates to the Defendant's guilt.

The Defendant asserts the State failed to show that Jones was not making an unlawful unauthorized entry into the occupied dwelling of Blanchard. The Defendant additionally asserts that he owned the trailer in which Blanchard lived and he was entitled to prevent a forced unauthorized entry by Jones. Further, Jones committed a battery upon entering the residence. Thus, the Defendant was entitled to use deadly force to prevent the unlawful entry.

> In *State v. Richards*, 06-1553, p. 16 (La.App. 3 Cir. 5/2/07), 956 So.2d 160, 170-71, *writ denied*, 07-1129 (La.12/14/07), 970 So.2d 529, the court held in pertinent part:
>
>> Homicide is justifiable in some instances: in cases of self defense; if necessary to prevent a violent or forcible felony involving danger to life or great bodily harm; in situations where the offender reasonably believes the victim is likely to use unlawful force against a person present in a dwelling, business, or motor vehicle; and when the offender is lawfully inside a dwelling, business, or motor vehicle and the offender reasonably believes that deadly force is necessary to either repel an intruder or force the intruder to leave the premises. La.R.S. 14:20. "When a defendant claims self-defense in a homicide case, the State bears the burden of establishing beyond a reasonable doubt that the defendant did not act in self-defense." *State v. Loston*, 03-977, p. 9 (La.App. 1 Cir. 2/23/04), 874 So.2d

197, 204, *writ denied*, 04-792 (La.9/24/04), 882 So.2d 1167.

In examining a claim of self-defense, it is necessary to consider: (1) whether the defendant had a reasonable belief that he was in immediate danger of death or great bodily harm; (2) whether, under circumstances such as the possibility of escape, killing was necessary to prevent that death or great bodily harm; and (3) whether the defendant was the aggressor in the conflict. *State v. Jenkins*, 98-1603 (La.App. 4 Cir. 12/29/99), 750 So.2d 366, *writ denied*, 00-556 (La.11/13/00), 773 So.2d 157. "A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict." La.R.S. 14:21.

Recently, in *State v. Mincey*, 08-1315 (La.App. 3 Cir. 6/3/09), 14 So.3d 613, this court reviewed whether or not the State presented sufficient evidence to disprove the defendant's defense of justification. In *Mincey*, the victim, Jerome Dejean, was at a nightclub. While at the club, the defendant bumped into Dejean on his way to and from the bathroom. The two exchanged words, and the defendant exited the club followed by two of the victim's friends, Jones and Doucet. The two friends confronted the defendant about the incident. An argument ensued, and the defendant advised them he had a gun. Dejean came out and confronted the defendant. The Defendant's mother, who was also at the club, intervened and stood between the defendant and Dejean in an attempt to mediate the dispute. As she placed her hand on Dejean's chest, he pushed her hand aside and attempted to punch the defendant. The defendant shot him in the chest and fled. "According to the defendant's mother, Dejean was in 'mid-swing whenever he got shot.'" *Id*. at 614.

On appeal, the defendant did not deny that he shot and killed the victim, but argued that the State failed to disprove that he acted in self-defense. Specifically, the defendant argued that the killing was justifiable because he had his back against the wall, and was surrounded by the victim and the victim's two friends. Additionally, he contended that shooting the victim was the only way he could escape. Furthermore, the defendant claimed that one of the victim's friends had a firearm, but this was disputed by both of the victim's friends at trial. This court held in pertinent part:

The essence of his defense is that he was justified in responding to an attempted punch by shooting his opponent in the chest at close range. We recognize that

Dejean had two friends with him. Thus, Defendant may have genuinely felt endangered; further, some level of fear was objectively reasonable. However, the level of force he used to defend himself was far beyond what was necessary under the circumstances.

. . . .

This analysis applies even if the jury believed the testimony of Defendant's most favorable witness, Ms. Bryant, the Defendant's mother.

. . . .

[A]s mentioned earlier, responding to an oncoming punch by shooting the other person in the chest is an excessive response. Thus, the jury's determinations in the present case were not unreasonable. Therefore, the Defendant's reliance on self-defense is meritless.

*Id*. at 616.

*State v. Levier*, 09-238, pp. 13-15 (La.App. 3 Cir. 11/4/09), 21 So.3d 1139, 1147-48.

The Defendant herein used deadly force against an unarmed victim who had his face and arm reconstructed and whose arm was in a cast. Thus, we find that the trial court could rationally have concluded that the Defendant did not act in self-defense, that his actions were not justified, and his response was excessive. Accordingly, this assignment of error lacks merit.

COUNSEL'S ASSIGNMENT OF ERROR NO. 1 & *PRO SE* ASSIGNMENT OF ERROR NO. 35:

In his first counsel-filed assignment of error, the Defendant contends he did not make a knowing and intelligent waiver of his right to a jury trial. In his thirty-fifth *pro se* assignment of error, the Defendant contends he did not tender a knowing and intelligent waiver of his right to a jury trial.

Counsel asserts that the record does not clearly reflect that the Defendant waived his right to trial by jury. He contends there is no colloquy in the record of the

waiver, and the waiver cannot be presumed to be knowing and intelligent. He urges that Defendant's convictions should be reversed, and the matter remanded for a new trial. After counsel's brief was filed, this court received a supplemental record containing a transcript of the hearing at which the Defendant waived his right to trial by jury. Notice of receipt of the supplemental record was sent to counsel on September 29, 2009. Counsel did not submit a supplemental brief regarding this issue. As this court has received a transcript of the waiver, we find that counsel's first assigned error lacks merit.

The Defendant makes no argument regarding *pro se* assignment of error number thirty-five. This assignment of error is considered to be abandoned. Uniform Rules—Courts of Appeal, Rule 2-12.4.

## COUNSEL'S ASSIGNMENT OF ERROR NO. 2 & *PRO SE* ASSIGNMENT OF ERROR NO. 36:

In his second counsel-filed assignment of error and thirty-sixth *pro se* assignment of error, the Defendant contends the record does not indicate that the indictment was signed by the foreperson of the grand jury.

The indictment found in the record is signed by the grand jury foreperson. Thus, these assignments of error lack merit.

## *PRO SE* ASSIGNMENTS OF ERROR NOS. 1 & 25; SUPPLEMENTAL *PRO SE* ASSIGNMENT OF ERROR NO. 3:

In his first and twenty-fifth *pro se* assignments of error and third supplemental *pro se* assignment of error, the Defendant contends the State leveled charges of the cause and manner of death of Edward Jones in its opening statement and failed to prove the charges it made.

The Defendant asserts the State, in its opening statement, alleged that he shot

Jones in the head. The Defendant contends this was contradicted by the coroner's report. Thus, because the State failed to prove the assertions it made in its opening statement, the Defendant contends the charge at issue should be dismissed.

The coroner's report indicates Jones died as the result of a close-range gunshot wound to the right shoulder and chest. Therefore, the Defendant's assertion that the remarks made by the State in its opening statement were incorrect is true. However, the Defendant did not object during the State's opening statement or move for a mistrial. Therefore, the Defendant waived review of this issue. La.Code Crim.P. art. 841. Accordingly, these assignments of error will not be considered.

### *PRO SE* ASSIGNMENTS OF ERROR NOS. 2 & 3; SUPPLEMENTAL *PRO SE* ASSIGNMENT OF ERROR NO. 5:

In his second and third *pro se* assignments of error and fifth supplemental *pro se* assignment of error, the Defendant contends a warrant to seize a shotgun and shells was served without authorization at his residence at night, and the evidence seized should not have been admitted at trial.

During trial, defense counsel objected, at the Defendant's request, to the admissibility of a shotgun and shells seized from the Defendant's residence pursuant to a search warrant. He alleged that police did not have authorization to execute the search warrant at night.

The search warrant at issue reads, in pertinent part, as follows: "YOU ARE (ARE NOT) AUTHORIZED to execute this warrant and to make this search during the daytime or the nighttime and if the property herein described be found on the (premises) (person) (vehicle) herein described, to seize the said property in accordance with law."

The trial court found that "unless it is scratched out the reading is that you are

authorized and I also note that this Search Warrant was signed at 9:49 P.M." and overruled defense counsel's objection.

Louisiana Code of Criminal Procedure Article 163(B) provides that "[a] search or seizure shall not be made during the nighttime or on Sunday, unless the warrant *expressly* so directs." (emphasis added).

Unreasonable searches and seizures are prohibited by the Fourth Amendment to the United State[s] Constitution and Article 1, Section 5 of the Louisiana Constitution. In the chain of criminal prosecution, the initial protection against unreasonable searches is the requirement that law enforcement officers obtain judicial sanction, via warrant applications, for searches; ultimately, in court, constitutional protections are enforced by application of the exclusionary rule. La.C.Cr.P. art. 703 (suppression of "unconstitutionally obtained" evidence). The exclusionary rule is not an absolute, however. Operating hand in hand with it is the, by now, fairly well established "good faith" exception which allows introduction in court of evidence seized by officers in good faith reliance on warrants which are later determined to be, for one reason or another, legally deficient. *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *State v. Varnado*, 95-3127 (La.5/31/96), 675 So.2d 268: *State v. Singleton*, 98-387 (La. App. 5 th Cir. 10/28/98), 723 So.2d 484. Falling under the authority of the good faith doctrine are cases where search warrants are ruled deficient because they do not conform to some particular statutory requirement. Our courts have categorized these as mere "statutory" or "procedural" violations, and have held that they *do not* invoke constitutional scrutiny. Nevertheless, application of the *Leon* exception still does rely, though perhaps in varying degrees, on a finding of good faith in each case.

*State v. Matthieu*, 506 So.2d 1209 (La.1987), for example, involved a search "merely" violative of a procedural rule: the search had been made pursuant to a warrant ultimately ruled "technically contrary" to law because it described a location found outside of the signing judge's territorial authority. Though the court found the search *not unconstitutional*, admission of the evidence seized does seem also to turn on the finding that the officers had committed an "honest" error of judgment. *Matthieu*, 506 So.2d at 1213. In *State v. Barrilleaux*, 620 So.2d 1317 (La.1993), the warrant violated the "four corners" requirement of La. Code of La.C.Cr.P. art.162 (warrant and supporting affidavit required to show on face facts giving rise to probable cause), and in this case, though the court held the use of oral testimony to supplement the deficient affidavit not of itself unconstitutional, it seems that a finding of good faith was perhaps the controlling factor in upholding the search. *Barrilleaux*, 620 So.2d at 1321 through 1323

-25-

(lengthy discussion of exclusionary rule's preventive, as opposed to curative, role). Finally, in a recent decision discussing just such a violation as occurred in the instant case--violation of article 163's requirement that warrants "expressly" authorize nighttime searches-though the court found no constitutional violation, they did still give some, though not lengthy, consideration to the facts indicating good faith on the part of the officers in question. *State v. Nicholas*, 94-1096 (La.App. 1st Cir. 3/3/95), 652 So.2d 666, *writ denied*, 95-0761 (La.6/23/95), 656 So.2d 1013. In *Nicholas,* the court held that "... merely because a violation of article 163 occurs (when a search is conducted after dark at 9:30 p.m. without specific authorization for a nighttime search), suppression of the evidence *is not required*." *Nicholas*, 652 So.2d at 669 (emphasis added). Nevertheless, in addition to this holding, the court discusses the good faith of the officers in question, though briefly, and finds that the officers probably "... overlooked or were unaware of the requirement of article 163." *Nicholas*, also at p. 669.

We agree that violations of article 163 do not necessarily amount to constitutional violations . . . .

*State v. Brown*, 99-598, pp. 4-6 (La.App. 5 Cir. 12/15/99), 750 So.2d 262, 265-66.

The search warrant at issue is ambiguous and did not *expressly* allow for a search of the Defendant's home at night. Thus, the search was conducted in violation of La.Code Crim.P. art. 163. However, this violation was not a constitutional violation.[1]

The warrant at issue was signed at 9:49 p.m. and executed that night. Further, at trial, Detective Marvin Hilton testified that it was not clear whether he could search the Defendant's residence at night. Based on this information, we find that police were in good faith when they executed the search warrant at night. Accordingly, the evidence at issue was properly admitted.

For the reasons asserted herein, these assignments of error lack merit.

### *PRO SE* ASSIGNMENTS OF ERROR NOS. 4 & 5:

---

[1]The Defendant does not suggest the warrant was not supported by probable cause, nor does he suggest that the search was unreasonable.

In his fourth *pro se* assignment of error, the Defendant contends that both he and defense counsel raised the issue of conflict of interest between client and counsel by motions prior to the trial and again in open court prior to trial on the merits, and the trial court refused to look into the matter to determine if a conflict of interest existed. In his fifth *pro se* assignment of error, the Defendant contends the trial court cancelled a hearing already in progress on conflict of interest and withdrawal of counsel and denied him the right to represent himself, ordered counsel to continue to represent him, and refused to determine if a conflict of interest existed.

On February 3, 2009, defense counsel filed a "MOTION AND ORDER TO WITHDRAW AS COUNSEL OF RECORD OR, IN THE ALTERNATIVE, TO HAVE COURT REVIEW WHETHER OR NOT A CONFLICT EXISTS BETWEEN COUNSEL AND DEFENDANT SUCH THAT COUNSEL CANNOT CONTINUE TO REPRESENT DEFENDANT." Therein, defense counsel asserted that he had received a "Motion for Order to Force Deposition by Counsel," which the Defendant had filed *pro se*. In the Defendant's motion, he had asserted that defense counsel refused to comply with his wishes and committed a number of unethical and/or incompetent acts or omissions. Defense counsel asked the trial court to determine whether a conflict existed which would prevent himself and the Defendant from working together.

At a hearing held on March 3, 2005, the Defendant informed the trial court that he had reported defense counsel to the Attorney Disciplinary Board. The trial court asked the Defendant if he wanted to proceed without an attorney, and the Defendant indicated that he wished to do so. After questioning the Defendant, the trial court denied the request.

The trial court subsequently dismissed a motion to compel defense counsel to take depositions and a motion to compel defense counsel to provide the Defendant with psychiatric care, both of which were filed *pro se*. The trial court stated that all *pro se* motions were to be filed by defense counsel.

The motion to withdraw was then taken up by the trial court. Defense counsel informed the trial court that the Defendant, in his *pro se* motions, made several claims that would constitute a conflict of interest between client and counsel. The trial court subsequently denied defense counsel's motion to withdraw, noting that a copy of the complaint the Defendant alleged he had filed with the Attorney Disciplinary Board had not been provided.

In brief to this court, the Defendant asserts that the conflict issue was raised prior to trial, and, once the conflict issue was raised, the trial court had a duty to look into the matter. Further, its failure to do so constituted reversible error. In support of his argument, the Defendant cites *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708 (1980) and *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173 (1978).

This court discussed *Cuyler* and *Holloway* in *State v. Jones*, 96-1581, pp. 11-12 (La.App. 3 Cir. 6/4/97), 696 So.2d 240, 246, as follows:

> If a conflict of interest between the defendant and his attorney is raised before trial, the standard set forth in *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) applies. In *Holloway*, the defendant raised the issue of ineffective counsel due to a conflict of interest before trial. The Supreme Court held that when the claim is raised before trial, a trial judge is required to either appoint separate counsel or ascertain whether the risk of a conflict of interest is too remote to warrant separate counsel. *Id. See also State v. Wille*, 595 So.2d 1149, 1153 (La.1992), *cert. denied*, 506 U.S. 880, 113 S.Ct. 231, 121 L.Ed.2d 167 (1992). If, however, the conflict is raised after trial, the standard set forth in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333, (1980) is applied. *Wille*, 595 So.2d 1149. Under this standard, a defendant must establish that an actual conflict of interest exists which adversely affects his lawyer's performance.

*Cuyler*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333. *See also Wille*, 595 So.2d 1149.[2]

The trial court dismissed the Defendant's motions and stated that defense counsel would be allowed to file the motions. The trial court then denied defense counsel's motion to withdraw. We find that a full hearing was held regarding these issues, and defense counsel was not precluded from raising same again. The claims asserted in the trial court were more akin to ineffective assistance of counsel than a conflict of interest. Accordingly, the cases cited by the Defendant are not applicable to his claim. For the reasons asserted herein, these assignments of error lack merit.

### *PRO SE* ASSIGNMENTS OF ERROR NOS. 6 & 33; SUPPLEMENTAL *PRO SE* ASSIGNMENT OF ERROR NO. 2:

In his sixth *pro se* assignment of error, the Defendant contends that at the hearing on defense counsel's motion to withdraw, the trial court refused to allow him to represent himself, denying him a substantial constitutional right. In his thirty-third *pro se* assignment of error, the Defendant contends the court exceeded its jurisdiction by denying him the right to represent himself at trial and contravened federal law and U.S. Supreme Court rulings. In his second supplemental *pro se* assignment of error, the Defendant contends the trial court denied him the constitutional right to represent himself.

---

[2]In *Holloway*, 435 U.S. 475, three co-defendants were represented by a single attorney. All defendants filed timely motions for appointment of separate counsel based on counsel's representations that because of confidential information received from the co-defendants, he was confronted with the risk of representing conflicting interests and could not provide effective assistance for each client.

In *Cuyler*, 446 U.S. 335, two attorneys represented the defendant and two others charged with the same murders. The defendant who was tried first, made no objection to the multiple representation and was eventually convicted. The two co-defendants were later acquitted at separate trials. The defendant then sought collateral relief under Pennsylvania law, alleging that he had not received effective assistance of counsel because his lawyers represented conflicting interests.

The Defendant asserts that on March 3, 2009, the trial court denied him the right to represent himself at that hearing and in the case. The Defendant further asserts the legal standard used by the trial court to arrive at its ruling was improper.

The Defendant asserts the trial court denied his request to represent himself because he had no formal legal education and the case was complex. The Defendant additionally asserts the trial court made no effort to determine if he was competent in the law. Further, "although slightly convoluted, it is clear that the defendant asked the Judge about representing himself completely in the case and was told he could not."

> Defendant has a right to counsel, and to have counsel appointed if he cannot afford one, through the federal and state constitutions. U.S. Const.Amend. VI, La. Const. art. 1, § 13. However, his choice "must be knowingly and intelligently made and the assertion of the right to self-representation must be clear and unequivocal." *State v. Francis,* 07-373, p. 3 (La.App. 3 Cir. 10/3/07), 966 So .2d 1096, 1099.

> The *Francis* court, citing other cases from this circuit, the Louisiana Supreme Court, and the United States Supreme Court, discussed the standard for determining whether a defendant has validly waived his right to counsel:

>> Before a defendant may waive his right to counsel, the trial court must determine whether the defendant's waiver of counsel is intelligently and voluntarily made, and whether his assertion of his right to represent himself is clear and unequivocal. *State v. Hegwood*, 345 So.2d 1179 (La.1977). The determination of whether there has been an intelligent waiver of the right to counsel depends upon the facts and circumstances surrounding the case, including the background, experience, and conduct of the accused. *State v. Harper*, 381 So.2d 468 (La.1980). Although a defendant should be made aware of the dangers and disadvantages of self-representation, there is no particular formula which must be followed by the trial court in determining whether a defendant has validly waived his right to counsel. *State v. Carpenter*, 390 So.2d 1296 (La.1980). However, the record must establish that the accused knew what he was doing and that his choice was made "with eyes open." *Id.* at 1298, citing *Faretta v. California*, 422 U.S. 806, 95

S.Ct. 2525, 45 L.Ed.2d 562 (1975).

> The Third Circuit Court of Appeal has repeatedly required the trial court meet the following requirements in determining whether a defendant has validly waived his right to counsel: first, determine a defendant's literacy, competency, understanding and volition, i.e. was defendant's waiver of counsel made voluntarily and intelligently; and second, warn the defendant of the dangers and disadvantages of self-representation, so that the record establishes that the defendant knew what he was doing. [*State v.*] *Mitchell*, 580 So.2d 1006 [ (La.App. 3 Cir.1991), *writ denied,* 613 So.2d 969 (La.1993)]; [*State v.*] *Smith*, 479 So.2d 1062 [(La.App. 3 Cir.1985)]; *State v. Adams*, 526 So.2d 867 (La.App. 3 Cir.1988); *State v. Sepulvado,* 549 So.2d 928 (La.App. 3 Cir.1989); and *State v. Bourgeois*, 541 So.2d 926 (La.App. 3 Cir.1989), *writ denied,* 572 So.2d 85 (La.1991).

*State v. Hayes,* 95-1170, pp. 4-5 (La.App. 3 Cir. 3/6/96), 670 So.2d 683, 685-86. *See also State v. Johnson,* 06-937 (La.App. 3 Cir. 12/6/06), 944 So.2d 864, and *State v. Whatley,* 03-655 (La.App. 3 Cir. 11/5/03), 858 So.2d 751.

*Id.*

*State v. Laird*, 09-831, pp. 7-8 (La.App. 3 Cir. 2/10/10), __ So.3d __.

At a pre-trial conference held on March 3, 2009, the Defendant informed the trial court that he had reported his attorney to the Attorney Disciplinary Board. He then requested to represent himself. The trial court asked the Defendant his name, age, and about his education level and work history. The trial court then asked the Defendant what he was charged with and if he had been involved in a prior criminal proceeding or a civil lawsuit. The Defendant was subsequently asked if he had studied law in college. The Defendant indicated that he understood that if he was representing himself the trial court would not be able to answer any of his questions or give him advice. The Defendant subsequently informed the trial court that a waiver of the right to counsel must be intelligent and knowing, he must be aware of

the risks involved, be competent to proceed, and be aware of the ramifications of his actions. The trial court then asked the Defendant the following: "Let me ask you this question, is it a situation where you don't want any Lawyer or you just don't want the Lawyer that you have?" The Defendant responded as follows:

> A. Well, because he is currently barred by conflict of interest because he was turned in to the Attorney Discipline Board I would stand on Criminal Code of Procedure Article 511 - - Article 511 which states that in every instance the Defendant has the right to defend himself and to have Counsel. Since there is no counsel that is allowed by law to represent me in this particular instance I would stand on that Statutory Right and say that in this instance I want to defend myself, period.

> Q. That didn't really answer my question. If there is a Lawyer competent to represent you do you want that Lawyer or do you . . .

> A. No, I did answer the question, I don't want a Lawyer to represent me in this instance, I'm familiar with the extent of what is involved and I would like to proceed because neither Counsel is by law allowed to represent me in this particular instance and I'm not waiving Counsel altogether, but, since neither one can represent me today I want to proceed.

The trial court then asked the Defendant what he meant by the remark that he was not waiving counsel altogether. The Defendant responded, "That means that after these Attorneys have withdrawn I'm not by waiving Counsel to proceed in this proceeding today saying that I do not ever want any counsel."

The trial court made the following ruling: "I find based on the responses of the Defendant, who has never studied law and does not make a full complete waiver that I'm not going to allow you to proceed and represent yourself in these proceedings." The Defendant objected, stating the trial court was asking him to give up counsel permanently for something that did not require him to do so. The trial court subsequently informed the Defendant that his request was denied because he had not studied the law and the case was complex.

In *Laird*, this court discussed the defendant's actions as follows:

> At Defendant's first appearance before the trial court, he said he was indigent and asked the court to appoint a lawyer to represent him. Defendant made numerous pro se filings (apparently including a motion for self-representation), criticized the performance of his attorneys and "fired" his first attorney, but never specifically objected to having court-appointed counsel.
>
> Indeed, Defendant's "Motion to Reconsideration the Denial of Previous Motions" requested "that he be allowed someone to fill-in because he is (not) able to read nor write." Defendant's pro se "Motion to Appear as Co-Counsel Pro Se" acknowledged he was represented by the Indigent Defender Board and asked the court "to grant him permission to appear pro se as co-counsel with the Indigent Defenders Office."
>
> Defendant did not make a clear and unequivocal waiver of his right to counsel at the hearing of his motion for self-representation. He told the trial court that he needed someone to represent him because he could not read or write. Likewise, at the hearing of Mr. Demourelle's Motion to Withdraw, Defendant was not clear and unequivocal when discussing the issue of self-representation. When the trial court appointed Mr. Guidry, this exchange occurred:
>
>> [Defendant]: I don't need an attorney, Your Honor. I will represent myself in this case.
>>
>> The Court: No, I have already ruled that you can't represent yourself.
>>
>> [Defendant]: Okay. Well, I want to represent myself. I want an attorney to help me. I don't need somebody that don't want to help me. I have got a serious charge . . . and I would like to represent myself because I can't find an attorney—you ain't appointed me an attorney yet that would help me in my matter. So, ma'am, I would just be better by myself. I would be better by myself. I want to go to trial as soon as possible and represent myself. I have that right.
>>
>> . . . .
>>
>> The Court: I have already ruled that you cannot represent yourself. So, I am appointing Mr. Guidry to represent you in this matter. And this is Mr. Guidry.
>>
>> [Defendant]: Okay. If he represents me fully, yes, ma'am.

But, if he don't I'm gonna go to trial with myself cause
I—. . . .

This situation is similar to that in *State v. Hypolite,* 04-1658 (La.App. 3 Cir. 6/1/05), 903 So.2d 1275, *writ denied,* 06-618 (La.9/22/06), 937 So.2d 381. This court noted the defendant's attempt to obtain new counsel was not an unequivocal request to represent himself; it was merely a request for substitute counsel because the defendant was unhappy with his court-appointed attorney.

Here, Defendant's testimony, filings, and actions indicate he in fact wants court-appointed counsel, but wants to be able to discharge his counsel and obtain new representation when his attorney, in his estimation, is not properly defending him. Defendant is not entitled to counsel of his choice; rather, he "only has the right under the federal constitution to effective representation." *State v. Reeves,* 06-2419, p. 37 (La.5/5/09), 11 So.3d 1031, 1056, *cert. denied,* --- U.S. ----, --- S.Ct. ---- (2009). Defendant has set forth no grounds to show ineffective representation, and he will have the opportunity to seek post-conviction relief on the ground of ineffective representation if he so chooses. La.Code Crim.P. art. 930.3. Accordingly, we find the trial court did not err in refusing to allow Defendant to waive his right to counsel and represent himself at trial.

*Id*. at pp. 8-9.

Based on this court's ruling in *Laird*, we find that the Defendant's request to represent himself was properly denied, as his request was not unequivocal.

The Defendant may have raised the issue of self-representation at other times during the proceedings in this matter; however, the Defendant did not reference any other hearings or portions of the record. Accordingly, we will not address such instances, if they exist. Uniform Rules—Courts of Appeal, Rule 2-12.4.

For the reasons asserted herein, these assignments of error lack merit.

### *PRO SE* ASSIGNMENTS OF ERROR NOS. 7 & 23:

In his seventh and twenty-third *pro se* assignments of error, the Defendant asserts that at the trial on the merits, he was refused admission of a custodial statement made by him on November 11, 2004, which was relevant to his state of

mind and material to his plea of not guilty by reason of insanity.

The Defendant asserts that almost any evidence offered for the purpose of determining his mental state is admissible. In support of his argument, the Defendant cites Fed.R.Evid. arts. 403 and 404. These provisions deal with the exclusion of relevant evidence on the grounds of prejudice, confusion, or waste of time, the admissibility of character evidence, and evidence of other crimes. The Defendant also cites *Hearst v. U.S.*, 451 U.S. 938, 101 S.Ct. 2018 (1981).

There was no objection made at the time the trial court denied admission of the statement at issue. Therefore, the Defendant waived review of any issues regarding his statement. La.Code Crim.P. art. 841. Accordingly, these assignments of error will not be considered.

### *PRO SE* ASSIGNMENT OF ERROR NO. 24:

In his twenty-fourth *pro se* assignment of error, the Defendant contends "the trial court refused to admit [his] videotaped statement for its offered purpose relevant to [his] material state of mind or mental state: admitted the evidence obtained from two exparte [sic] 'marion' civil procedural mode examinations and failed to prove [he] was not insane at the time period of alleged offenses beyond a reasonable doubt."

The Defendant asserts the statement he gave on November 11, 2004, was relevant, and the evidence obtained from Drs. Seiden and Williams was inadmissible, requiring a verdict of not guilty by reason of insanity.

As previously noted, the Defendant did not object to the trial court's ruling excluding the statement he gave on November 11, 2004. Thus, he waived review of any issues regarding that statement. La.Code Crim.P. art. 841. Further, the reports of Drs. Seiden and Williams were admitted by joint stipulation. "A stipulation has

the effect of binding all parties and the court. . . . Such agreements are the law of the case." *State v. Smith*, 39,698, p. 13 (La.App. 2 Cir. 6/29/05), 907 So.2d 192, 199. For these reasons, these issues will not be considered.

The Defendant asserts it was not proven that he was not insane at the time of the offenses. The Defendant makes no argument regarding this issue. Furthermore, it is incumbent upon the Defendant to prove that he was insane at the time of the offenses. La.Code Crim.P. art. 652. Accordingly, this issue will not be considered pursuant to Uniform Rules—Courts of Appeal, Rule 2-12.4.

*PRO SE* ASSIGNMENTS OF ERROR NOS. 8, 9 & 10:

In his eighth *pro se* assignment of error, the Defendant contends the trial court admitted evidence from two ex parte civil procedure mode of examinations intended for use in a criminal proceeding. In his ninth *pro se* assignment of error, the Defendant contends these examinations were a form of "marion" civil procedural examination "intended for use in a criminal proceeding and are outlawed for use in a criminal proceeding." In his tenth *pro se* assignment of error, the Defendant contends the trial court refused to allow a witness to the ex parte examinations intended for use in a criminal proceeding and refused to ensure that a verbatim record of the proceedings was allowed, kept, or made.

In support of his argument, the Defendant cites *Burton*, *Davis v. Washington*, and *Ill v. Washington*. No citations for these cases were given. The Defendant then asserts that the evidence is inadmissible pursuant to *Sun Wong*, for which he provides no citation.

The Defendant next asserts that the provisions of the chapter and title on insanity proceedings provided for by "statute §404 by memory 404 B stating that

witnesses for the sanity examinations shall be provided upon motion of the defendant the court of the sanity commission and the 6th amendment of the United States constitution provides for favorable evidence independent testing of evidence by the defendant." The Defendant argues that by refusing to allow him as a witness to or to require a record of the verbatim proceeding of the sanity examinations, the trial court assisted in the guaranteed destruction of the actual evidence and prevented him from subjecting it to independent analysis and effective confrontation of the sanity members' opinions.

The Defendant mentions the phrase "marion ex parte civil mode of criminal procedure" on page 1138 of the record at which time he is discussing *pro se* motions that had been filed. This is found in the transcript of the sanity commission hearing conducted on August 23, 2006.

We cannot determine what the Defendant is referring to when he discusses the "marion ex parte civil mode of criminal procedure." Further, he does not point to any portion of the record when discussing this issue. For these reasons, these assignments of error will not be considered. Uniform Rules—Courts of Appeal, Rule 2-12.4.

### *PRO SE* ASSIGNMENTS OF ERROR NOS. 11 & 12:

In his eleventh *pro se* assignment of error, the Defendant contends co-defendant Jeremy Blanchard was not severed from the indictment prior to trial. In his twelfth *pro se* assignment of error, the Defendant contends that if Blanchard was severed before trial, the Defendant's indictment was not amended, leaving a defect of substance. Further, neither the short form indictment nor the warrants informed him of the cause or nature of any capital prosecution.

There is no indication in the record that Blanchard was severed from the

indictment or that the indictment was amended prior to trial. However, the Defendant points to no jurisprudence to support his contentions that Blanchard should have been severed from the indictment and points to no prejudice he suffered because of the failure to do so.

For this reason, we find that this assignment of error lack merit.

*PRO SE* ASSIGNMENTS OF ERROR NOS. 13, 14, 15, 16, 17, 18, 19, 20, 21 & 22:

In his thirteenth *pro se* assignment of error, the Defendant contends the State exceeded the time limitations allowed by statute to convene and commence the trial on the merits. In his fourteenth *pro se* assignment of error, the Defendant contends the State failed to establish that it commenced the trial itself timely and did not improperly exceed the time limitations as required by statute. In his fifteenth *pro se* assignment of error, the Defendant contends he was prejudiced by his inability to argue the matter of limitations due to imposed counsel. In his sixteenth *pro se* assignment of error, the Defendant contends the trial court allowed the faulty time calculations of the State, which was an abuse of discretion, and unjustly prejudiced his cause in the matter of time calculations and tolling the time periods. In his seventeenth *pro se* assignment of error, the Defendant contends he was entitled to a dismissal because the State failed to commence the trial timely. In his eighteenth *pro se* assignment of error, the Defendant contends the State failed to establish that it did not seek the death penalty for the purpose of evading the statutory time limitations. In his nineteenth *pro se* assignment of error, the Defendant contends there was an operational bar to the State proceeding to trial, which existed until after the State had impermissibly exceeded the time limitations. In his twentieth *pro se* assignment of error, the Defendant contends the trial court impermissibly relaxed the State's burden

of proof in calculating time limits by allowing in the State's faulty calculations. In his twenty-first *pro se* assignment of error, the Defendant contends the State was improperly allowed faulty arguments on time calculations, which were charged in error to the Defendant. In his twenty-second *pro se* assignment of error, the Defendant contends the trial court's action at the hearing on the motion to quash in allowing the State to impermissibly charge the Defendant for delays and allowing the State impermissible calculations, forced him to share the State's interest in its legal burden and relaxed its burden, necessitating a new judicial hearing on exceeding the time limitations.

In the case of a capital felony, the time limitation for commencement of trial is three years from the date of institution of the prosecution. La.Code Crim.P. art. 578(A)(1).

> The date of institution of prosecution is the date when the indictment is returned or the bill of information is filed. *State v. Gladden*, 260 La. 735, 257 So.2d 388 (1972), *cert. denied*, 410 U.S. 920, 93 S.Ct. 1377, 35 L.Ed.2d 581 (1973); *State v. Watts*, 99-57, p. 3 (La.App. 5th Cir.1999), 738 So.2d 628, 629. If the time limitation for trial expires and the defendant files a motion to quash before trial, the trial court shall dismiss the indictment and there shall be no further prosecution against the defendant for the same or a lesser offense based on the same facts. La.C.Cr.P. 581. La.C.Cr.P. art. 579 provides for the *interruption* of the time limitation, as follows:
>
> > A. The period of limitation established by Article 578 shall be interrupted if:
> >
> > (1) The defendant at any time, with the purpose to avoid detection, apprehension, or prosecution, flees from the state, is outside the state, or is absent from his usual place of abode within the state; or
> >
> > (2) The defendant cannot be tried because of insanity or because his presence for trial cannot be obtained by legal process, or for any other cause beyond the control of the state; or

(3) The defendant fails to appear at any proceeding pursuant to actual notice, proof of which appears of record.

B. The periods of limitation established by Article 578 shall commence to run anew from the date the cause of interruption no longer exists.

La.C.Cr.P. art. 580 provides that the time limitation is *suspended* when a defendant files a motion to quash or other preliminary plea. A preliminary plea is any pleading or motion filed by the defense which has the effect of delaying trial. *State v. Brooks*, 02-792, p. 2 (La.2/14/03), 838 So.2d 778, 782, *reh'g denied*, 02-792 (La.3/21/03). These pleadings include properly filed motions to quash, motions to suppress, or motions for a continuance, as well as applications for discovery and bills of particulars. *Id.*

In *State v. Rome*, 93-1221, p. 4 (La.1/4/94), 630 So.2d 1284, 1287, the Louisiana Supreme Court discussed the distinction between "interruption" and "suspension." The Court stated:

An interruption of prescription occurs when the state is unable, through no fault of its own, to try a defendant within the period specified by statute, in this case two years.... Once the cause of interruption disappears, the two-year time limit begins anew. *See* La.Code Crim.Proc.Ann. art. 579(B). In contrast, the prescriptive period is merely suspended, until the trial court rules on the filing of preliminary pleas. The relevant period is simply not counted, and the running of the time limit resumes when the motions are ruled on. Note, however, that "in no case shall the state have less than one year after the ruling to commence the trial." La.Code Crim.Proc.Ann. art. 580. (Footnote omitted).

*State v. Quinones*, 03-907, pp. 5-6 (La.App. 5 Cir. 12/30/03), 864 So.2d 824, 827.

A Motion to Quash was filed on May 5, 2009. Therein, the Defendant asserted the indictment was filed on December 6, 2004, and the matter was scheduled for trial on May 11, 2009, more than five years after the indictment was filed.

A hearing on the motion was held on May 11, 2009. At the hearing, the State asserted the issue of sanity was raised by the defendant on October 17, 2005. A sanity hearing was held on August 23, 2006. A "conflict of Counsel" was filed on

December 13, 2004, and a ruling thereon issued on March 3, 2005. After defense counsel Gary Proctor withdrew, the defense filed a motion stating the matter could not proceed because a second chair death-certified attorney could not be found. Another attorney was not appointed until September 5, 2007. Further, a modification of the plea was entered on January 3, 2008. A motion for continuance was filed on May 30, 2008. The State further asserted that it had moved for a trial fixing several months sooner than that which was actually scheduled. Additionally, two hurricanes occurred during the pendency of the case. Further, the Defendant made a motion to represent himself, which was eventually denied.

The trial court denied the motion, finding there had been many interruptions, delays, and continuances that were attributable to the Defendant.

The Defendant asserts the State was incorrect when it claimed it had one year after the sanity hearing to commence trial. The Defendant contends the State had one year if he was found to be unable to proceed to trial because he was insane. The Defendant further asserts the State was incorrect in its claim that it had one year to commence trial after the ruling on the Defendant's motion to quash.

The Defendant further contends he was not allowed to argue the correct time calculations because of defense counsel. Thus, a new hearing is warranted. The Defendant goes on to assert that the State failed to aver that its purpose in seeking the death penalty and then changing its mind was not for the purpose of evading the time limitations.

The Defendant makes claims regarding the State's failure to timely turn over the statements of Lisa Bernard and Jennifer Carpenter and asserts this acted as an operational bar which makes the State responsible for the time between November

9, 2004, and April 8, 2009, when the statements were provided to the Defendant.

The indictment in this matter was filed on December 6, 2004. Absent a suspension or interruption of the three-year time limitation, the State had until December 6, 2007, in which to commence trial. Trial did not begin until May 11, 2009.

There were numerous filings which interrupted or suspended the running of the time limitation in this matter; however, we will limit the discussion to filings that occurred just prior to and after December 6, 2007. On September 5, 2007, prior to the expiration of the three-year time limitation, defense counsel filed a motion to continue. The motion was granted on the same date and trial was continued without date. On November 29, 2007, trial was rescheduled for June 9, 2008. On January 3, 2008, the Defendant filed a motion to modify his guilty plea. On May 30, 2008, defense counsel filed a motion to continue, which was granted on June 3, 2008. On February 2, 2009, a "Motion for Order to Force Deposition by Counsel" was filed. Counsel filed a motion to withdraw on February 3, 2009, which was denied on March 3, 2009. A request for discovery and a motion to quash were filed on May 5, 2009. On May 6, 2009, a motion to suppress and a motion in limine were filed. The motion to suppress and motion to quash were denied on May 11, 2009. Trial commenced on May 11, 2009.

The filings discussed herein constitute preliminary pleas and suspended the running of the time limitation. *See State v. Jones*, 34,542 (La.App. 2 Cir. 2/28/01), 780 So.2d 1234, *writ denied*, 01-2820 (La. 8/16/02), 822 So.2d 613. Further, the State would have one year from the date the trial court issued rulings on the motions to proceed to trial. La.Code Crim.P. art. 580. Thus, the Defendant's trial commenced

timely, and the trial court properly denied his motion to quash. Accordingly, these assignments of error lack merit.

## *PRO SE* ASSIGNMENTS OF ERROR NOS. 30, 31 & 32; SUPPLEMENTAL *PRO SE* ASSIGNMENT OF ERROR NO. 7:

In his thirtieth *pro se* assignment of error, the Defendant contends ineffective assistance was rendered by defense counsel. In his thirty-first *pro se* assignment of error, the Defendant contends defense counsel's representation was not competent. In his thirty-second *pro se* assignment of error, the Defendant contends he was denied constitutional assistance of counsel. Further, in his seventh supplemental *pro se* assignment of error, the Defendant contends he was denied a constitutional level of representation and defense counsel provided ineffective assistance and violated his rights.

First, the Defendant asserts that defense counsel was imposed unlawfully by the trial court and defense counsel refused to present a defense. Second, the defendant asserts that counsel "dirilected" the facts of the case, refused to investigate, sided with his former client, suppressed the facts given by the Defendant, and refused to prepare testimony for trial. Third, defense counsel refused to take depositions of witnesses who would be leaving the jurisdiction. Fourth, defense counsel failed to represent the Defendant's legal interests and a conflict of interest existed, which included the financial interests of the attorney, lack of funding, and misplaced loyalties. Last, defense counsel violated several ethical rules.

> In *Strickland v. Washington*, [466 U.S. 668, 104 S.Ct. 2052 (1984),] the United States Supreme Court set forth the test to determine whether the performance of a criminal defendant's counsel was deficient:
>
>> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made

errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

Thus, the defendant must make both showings before the conclusion will be reached that his conviction was a result of a breakdown in the adversarial process rendering the conviction unreliable. Accordingly, if either is not met, then the claim of ineffective assistance of counsel will be disposed of.

*State v. Scott*, 09-748, p. 7 (La.App. 3 Cir. 12/9/09), 26 So.3d 313, 317-18.

The Defendant does not present any proof of his allegations or point to any portion of the record to support his various claims. Thus, the Defendant has failed to meet his burden of proof. Accordingly, these assignments of error lack merit.

SUPPLEMENTAL BRIEF *PRO SE* ASSIGNMENT OF ERROR NO. 8:

In his eighth *pro se* assignment of error, the Defendant contends no defense of insanity was prepared although he entered a plea of not guilty and not guilty by reason of insanity.

The Defendant contends his defense and his rights were prejudiced by defense counsel's refusal to prepare and present an insanity defense after he entered a plea of not guilty and not guilty by reason of insanity. The Defendant further contends that defense counsel initially insisted upon an insanity defense, but shortly before trial informed him that an insanity defense would not be presented.

The reports of Drs. Williams and Seiden were introduced at trial as Joint Exhibits 1 and 2. Additionally, a transcript of the hearing regarding the sanity commission was introduced as Joint Exhibit 3. These exhibits were submitted for

-44-

consideration on the issue of not guilty by reason of insanity. Further, in closing arguments, defense counsel argued that the Defendant was insane at the time of the commission of the offenses. Accordingly, the Defendant's assertion that defense counsel did not present an insanity defense is incorrect. Therefore, this assignment of error lacks merit.

SUPPLEMENTAL BRIEF *PRO SE* ASSIGNMENT OF ERROR NO. 9:

In his ninth *pro se* assignment of error, the Defendant contends he was denied adequate development of his defenses due to the unavailability of funds to do so.

The Defendant asserts the IDB refused to fund his insanity defense. He further asserts a hearing was held to determine the source of funds, but no source of funding was identified. Further, his defenses were prejudiced by lack of funding and the procedures outlined in *State v. Wigley*, 624 So.2d 425 (La.1993), were not followed. Additionally, the mandates of *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087 (1985), were violated. Further, pursuant to *State v. Citizen* and *State v. Tonguis* (consolidated cases), 04-1841 (La. 4/1/05), 898 So.2d 325, the State should have ceased prosecution until adequate funding became available.

The Defendant contends the IDB let defense counsel know there was no funding for investigations and an insanity defense. The Defendant then indicates that his constitutional rights were violated and cites *State v. Touchet*, 93-2839 (La. 9/6/94), 642 So.2d 1213, and *State v. Peart*, 621 So.2d 780 (La.1993). The Defendant further asserts that his rights were violated, preventing him from forming competent and legally sufficient defenses to which he was constitutionally entitled. Further, he contends that defense counsel was uncertain of being paid, and investigations and defense counsel's motivation and performance were adversely

affected.

A "Motion to Determine Source of Funds to Provide Competent Defense" was filed on January 12, 2005. Therein, the Defendant moved for issuance of an order to show cause why the Louisiana Indigent Defense Assistance Board, 30th Judicial District Indigent Defender Board, Vernon Parish Police Jury, 30th Judicial District Court, Vernon Parish District Attorney's Office, Vernon Parish Sheriff's Office, and the State of Louisiana through the Office of the State Budget Director, the State Legislature, and the Office of the Attorney General should not be designated as a source from which available funds would be provided for payment of the reasonable and necessary costs and fees for his defense. The Defendant also moved for the establishment of an hourly rate to reimburse counsel for overhead and an amount constituting a reasonable sum for attorney fees and legal assistance. Further, he moved for the establishment of a procedure for submission of invoices and payment on a monthly basis, and a procedure for submission of invoices and payment of expert witnesses and litigation assistance.

At a hearing on the motion, affidavits from the Chief Judge of the 30th Judicial District Court, Vernon Parish Sheriff's Office, and the Vernon Parish District Attorney's Office indicating they did not wish to fund a defense in this matter were admitted as evidence. Minutes of a police jury meeting, which indicated it declined to fund a defense, were also admitted as evidence. Further, a letter from the Office of Management and Budget through the Office of the Attorney General disclosing the funding scheme that was in place for indigent defense and what funds were available from the Office of Management and Budget were admitted. Defense counsel informed the trial court that it had deferred making any showing with regard to the

local Indigent Defender's Office or the Louisiana Indigent Defense Assistance Board

and asked that those decisions be deferred. The trial court then found that pursuant

to *Citizen*, the State of Louisiana through the indigent defender board was responsible

for providing funding for a defense.[3]

In *State v. Reeves*, 06-2419, pp. 14-21 (La. 5/5/09), 11 So.3d 1031, 1043-47,

*cert. denied*, __ U.S. __, 130 S.Ct. 637 (2009) (footnote omitted), the supreme court

discussed the cases cited by the Defendant as follows:

*State v. Peart*

In 1993, in *State v. Peart*, *supra,* this court considered a multifaceted ruling made by a criminal district court judge in Orleans Parish based on that judge's examination of the defense services being provided to indigent defendants in that section of court by the public defender's office. The trial judge ruled that three statutes regarding indigent defense and its funding were unconstitutional as applied in the City of New Orleans. In addition, the trial judge ordered that the legislature provide funding for improved indigent defense services and ordered a reduction in the caseloads of those attorneys representing indigent defendants in that section of court. *Peart*, 621 So.2d at 783.

This court reversed the district court's ruling, finding that the statutes at issue were not unconstitutional and that the remedies ordered by the trial judge were inappropriate at that time. *Id*. However, in *Peart*, this court made several important pronouncements regarding the funding of indigent defense and the caseloads of those attorneys providing defense to the indigent, which are pertinent to the issues raised in the instant matter.

In *Peart*, this court held, *inter alia*, that a defendant may raise certain ineffective assistance of counsel claims, prior to trial, when judicial economy demands it. *Id*., 621 So.2d at 787. Additionally, the court held that a trial judge must make findings individually tailored to each defendant with regard to the representation he received or was receiving. *Id*., 621 So.2d at 788. The court also held, after a detailed review of the lack of funding and excessive caseloads of the indigent defenders in that particular section of Orleans Parish Criminal District Court, that defendants who were assigned counsel in that section received constitutionally deficient counsel. *Id*., 621 So.2d at 790. So finding, the court further held that a rebuttable presumption of counsel's

---

[3]No citation to *Citizen* was provided.

ineffectiveness could be applied in cases arising out of that section of court. *Id.*, 621 So.2d at 791. Finally, the court warned:

> If legislative action is not forthcoming and indigent defense reform does not take place, this Court, in the exercise of its constitutional and inherent power and supervisory jurisdiction, may find it necessary to employ the more intrusive and specific measures it has thus far avoided to ensure that indigent defendants receive reasonably effective assistance of counsel.

*Id.*, 621 So.2d at 791. The court remanded the case to the district court for retrial of the "Motion for Relief" filed on behalf of defendant, Peart, and for trial of other motions filed by indigent defendants in that section of court asserting pretrial claims of ineffective assistance of counsel. *Id.*, 621 So.2d at 791. In fashioning a remedy, this court instructed the district court:

> If the court, applying this presumption [of counsel ineffectiveness] and weighing all evidence presented, finds that Leonard Peart or any other defendant in [that section] is not receiving the reasonably effective assistance of counsel the constitution requires, and the court finds itself unable to order any other relief which would remedy the situation, then the court shall not permit the prosecution to go forward until the defendant is provided with reasonably effective assistance of counsel.

*Id.*, 621 So.2d at 791-792.

### *State v. Wigley*

While *Peart* dealt with a local public defender's office representing indigent defendants, the case of *State v. Wigley*, 624 So.2d 425 (La.1993), decided the same year as *Peart*, concerned the appointment of attorneys from the private bench to represent indigent defendants. In *Wigley*, the court reaffirmed that the "[un]compensated representation of indigents, when reasonably imposed, is a professional obligation burdening the privilege of practicing law in this state, and does not violate the constitutional rights of attorneys." *Id.*, 624 So.2d at 426. However, in order for the appointment to be reasonable, and not oppressive, the court also held that "any assignment of counsel to defend an indigent defendant must provide for reimbursement to the assigned attorney of properly incurred and reasonable out-of-pocket expenses and overhead costs." *Id.*, 624 So.2d at 429. The court charged the district judges with the authority to determine, in their discretion, what would constitute an unreasonable level of time that an attorney must devote to a particular case without compensation of a fee. "Such a system will

strike a balance between the attorney's ethical duty to provide services *pro bono publico* and his or her practical need to continue to perform his or her other obligations." *Id*., 624 So.2d at 429.

The court in *Wigley* levied another charge on the district courts. While acknowledging the fact that the source of funds from which appointed counsel may be reimbursed were, at that time, limited, the court directed the district judges to make the initial determination, before counsel is appointed, that sufficient funds "to cover the anticipated expenses and overhead are likely to be available to reimburse counsel." *Id*., 624 So.2d at 429. Moreover, the court instructed that "[i]f the district judge determines that funds are not available to reimburse appointed counsel, he should not appoint members of the private bar to represent indigents." *Id*. Recognizing the harshness of this remedy, the court nevertheless maintained that "budget exigencies cannot serve as an excuse for the oppressive and abusive extension of attorneys' professional responsibilities." *Id*.

### *State v. Touchet*

*Peart* and *Wigley* set forth remedies to ensure constitutionally-required assistance of counsel for indigent defendants. In addition to the right to counsel, an indigent defendant must also have a fair opportunity to present his defense. *Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S.Ct. 1087, 1092, 84 L.Ed.2d 53 (1985). This often requires the assistance of expert witnesses. When a defendant is indigent, he must obtain funding to pay for this expert assistance. However, in requesting certain types of expert assistance, the defense may be divulging important trial strategies.

In *State v. Touchet*, 1993-2839 (La.9/6/94), 642 So.2d 1213, the court considered whether, and to what extent, indigent defendants were entitled to *ex parte* hearings on their motions for state-funded expert witness services. In making its determination, the court sought to provide an indigent defendant a fair opportunity to present his defense while maintaining an adversary system. The proper balance is achieved by the court's holding:

> . . . an indigent defendant may file a motion for expert funding *ex parte*. Notice of the filing of the motion should be given to the state, which may file an opposition to the hearing being held *ex parte* and/or to the request for funding. The trial court should first determine, *in camera*, either on the face of the allegations of the motion or upon taking evidence at an *ex parte* hearing, whether the defendant would be prejudiced by a disclosure of his defense at a contradictory hearing. If so, then the hearing on expert funding should continue *ex parte*. If not, then

the hearing should be held contradictorily with the District Attorney. . . .

> At the hearing on expert funding, whether *ex parte* or contradictory, the defendant must first show a need for the funding. The defendant must show with a reasonable degree of specificity what type of expert is needed and for what purpose. In other words, the indigent defendant requesting governmental funding for the securing of expert assistance must show that it is more likely than not that the expert assistance will be required to answer a serious issue or question raised by the prosecution's or defense's theory of the case. If the defendant meets this burden, then the court is to order that the funds be provided by the state. If the defendant fails to meet this burden, and the proceedings were held *ex parte*, both the written reasons for denial and the record of the proceedings are to remain under seal during the pendency of the defendant's prosecution, including appellate review.

*Touchet*, 1993-2839 p. 14-15, 642 So.2d at 1221.

In *Touchet*, this court recognized that a district court must use its discretion in its decisions regarding the funding of expert assistance for indigent defendants. While noting that the state's substantial interest in protecting the public fisc demands that some form of opposition by the state be allowed, *Touchet* declared the district court to be an adequate guardian of the state's financial interests from frivolous requests for the funding of expert assistance. *Id.*, 1993-2839 p. 12, 642 So.2d at 1220-1221.

### *State v. Citizen*

Finally, the case of *State v. Citizen c/w State v. Tonguis*, 2004-1841 (La.4/1/05), 898 So.2d 325 ("*Citizen*") is important in this review. Although *Citizen* was handed down a few months after Reeves' retrial, these consolidated cases involved the separate prosecutions of two indigent capital defendants arising out of Calcasieu Parish, the same parish as Reeves' prosecution, and present an informative analysis of the mechanism for funding indigent defense prevailing at that time within that parish.

In *Citizen*, a parish-approved *ad valorem* tax constituted the largest component of the parish Criminal Court Fund, which maintained the court system and the District Attorney's Office, but not the local public defender's office. This fund operated at a surplus. By contrast, the local public defender's office was funded through court fees and an allocation of state funds and operated at a deficit. Expressing frustration

at the continued lack of funding in criminal cases, and faced with appointed defense counsel's Motion to Determine Source of Funds to Provide Competent Defense, the district court in *Citizen* declared unconstitutional two statutes that had recently been amended to prevent the use of local parish funds to pay for appointed defense counsel.  The district court further ordered the parish police jury to provide funds for appointed counsel for the two indigent capital defendants.

On appeal, this court reversed, upholding the constitutionality of the statutes.  The court held that the legislature, through statute, places the burden of paying indigent defense costs on the state.  The fact that the legislature failed to adequately fund indigent defense programs, and had, in the amendments to the statutes at issue, eliminated an alternative source of funding from the parishes, did not "diminish any of the constitutionally guaranteed rights and freedoms of these defendants or of their attorneys."  *Citizen*, 2004-1841 p. 13, 898 So.2d at 335.  Further, the court held the district court erred in ordering the police jury to place funds into the court registry for court-appointed attorneys or other case-related expenses when the legislature had made unmistakably clear that the state, and not the parish, was responsible for indigent funding.  *Id*., 2004-1841 p. 14, 898 So.2d at 336.

In addition to these holdings, the court reiterated, from its previous pronouncements in *Peart* and *Wigley*, that "budget exigencies" could not serve as an excuse for the oppressive or abusive extension of attorneys' professional responsibilities.  *Citizen*, 2004-1841 p. 15, 898 So.2d at 336.  Moreover, in order to ensure that indigent defendants are provided with their constitutional and statutory rights to counsel and to expert assistance, this court had, in the past, exercised its constitutional and inherent power and supervisory jurisdiction to impose corrective measures.  In fact, the court warned previously in *Peart* that more intrusive measures would be contemplated if the legislature failed to act. *Id*.

Although the court in *Citizen* noted that the legislature had taken positive steps since *Peart* to remedy the critical state of indigent criminal defense in Louisiana, there had been, as of that time, no resolution or legislative remedy for the underfunding and overworked conditions noted in previous cases.  *Id*., 2004-1841 p. 14-15, 898 So.2d at 336.  Finding that further corrective measures were needed to address the immediate problems of the instant defendants, the court in *Citizen* altered one of the rules set forth in *Wigley*.

Whereas in *Wigley* the court maintained that a district court should not appoint private counsel for an indigent defendant until a funding source was identified for the reimbursement of, at a minimum, the appointed counsel's expenses and overhead, the court in *Citizen* ordered that counsel be appointed for an indigent defendant from the

time of the indigent defendant's first appearance in court, "even if the judge cannot then determine that funds sufficient to cover the anticipated expenses and overhead are likely to be available to reimburse counsel." *Citizen*, 2004-1841 p. 16, 898 So.2d at 338. The court instructed that counsel appointed before a funding source was identified could subsequently file a motion to determine funding. Thereafter, if the district court determined that adequate funding was not available, this court authorized the defendant to file a motion to halt the prosecution until adequate funding became available. *Id*. *Citizen* authorized district judges, in their discretion, to prohibit the state from proceeding with a prosecution until he or she would be able to determine that appropriate funding was likely to be available thereafter. *Id*., 2004-1841 p. 16, 898 So.2d at 339.

This authority is no longer a matter of jurisprudential rule announced in *Citizen*. In its comprehensive revision of the statutory provisions establishing and regulating a state-wide indigent defender board, the legislature, in the Louisiana Public Defender Act of 2007, La. Acts 2007, § 307, explicitly recognized that *Citizen* "authorized trial judges to halt prosecutions in capital cases, upon motion of defense counsel, until adequate funding is provided to ensure an adequate defense, and it is the express intention of the legislature to ensure adequate resources, consistent with the *Citizen* opinion, which allow prosecutions in such cases to continue to conclusion resulting in verdicts that are fair, correct, swift, and final." La. R.S. 15:142(D). As previously noted, our decision in *Citizen* was rendered several months after the retrial of the instant case.

The trial court found the defense in this matter was to be funded by the State of Louisiana through the indigent defender board. Although the Defendant alleges he was denied adequate development of his defense, he fails to prove that his defense was actually altered or that he was denied any funding that was requested. Accordingly, this assignment of error lacks merit.

**CONCLUSION:**

For the foregoing reasons, the Defendant's convictions for first degree murder are affirmed.

**AFFIRMED.**